GARDEN STATE FARMS, INC., A CORPORATION OF NEW JERSEY, APPELLANT, v. JOSEPH C. MATHIS, JR., ACTING DIRECTOR OF DIVISION OF DAIRY INDUSTRY, RESPONDENT.

CUMBERLAND FARMS OF NEW JERSEY, INC., A NEW JERSEY CORPORATION AND BURLINGTON FOOD STORE, INC., A NEW JERSEY CORPORATION, APPELLANTS, v. PHILLIP ALAMPI, SECRETARY, NEW JERSEY DEPARTMENT OF AGRICULTURE, AND JOSEPH C. MATHIS, JR., ACTING DIRECTOR, DIVISION OF DAIRY INDUSTRY, NEW JERSEY DEPARTMENT OF AGRICULTURE, RESPONDENTS.

Argued March 2, 1970—Reargued after remand May 22 and 23, 1972—Decided September 8, 1972.

408.

*Mr. Nicholas Martini* argued the cause for appellant Garden State Farms, Inc.

*Mr. Sheldon A. Weiss* argued the cause for appellants Cumberland Farms of New Jersey, Inc. and Burlington Food Store, Inc. (*Messrs. Glauberman and Weiss,* attorneys; *Mr. Weiss* on the brief).

*Mr. Richard S. Cohen* argued the cause on reargument for intervenor-appellant Dairy Stores, Inc. (*Messrs. Cohen, Hoagland, Cohen and Keefe,* attorneys; *Mr. Richard S. Cohen* on the brief).

*Mr. Herbert K. Glickman,* Deputy Attorney General, argued the cause for respondents (*Mr. George F. Kugler, Jr.,*

Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. Glickman* on the brief).

*Mr. Roland Morris,* of the Pennsylvania bar, argued the cause on reargument for intervenor-respondent New Jersey Milk Institute, Inc. (*Messrs. McCarter and English,* attorneys; *Messrs. Duane, Morris and Heckscher,* of the Pennsylvania bar, of counsel).

*Mr. Donald F. Copeland,* of the Pennsylvania bar, argued the cause on reargument for intervenor-respondent Inter-State Milk Producers' Cooperative. (*Messrs. Backes and Backes,* attorneys; *Mr. Copeland* of counsel).

*Messrs. Stryker, Tams and Dill* filed a brief on reargument on behalf of amicus curiae Dairylea Cooperative, Inc. (*Mr. Walter F. Waldau and Mr. Edmund E. Winterbottom* of the New York bar, of counsel).

The opinion of the Court was delivered by

HALL, J. This case derives from two consolidated appeals of Order 69–1, fixing minimum prices for the sale of milk at retail, promulgated by the Director of the Division of Dairy Industry (Director), of the New Jersey Department of Agriculture under the milk control law of 1941, *N. J. S. A.* 4:12A–1, *et seq.,* particularly *N. J. S. A.* 4:12A–21 to 23. The appellants are two vertically integrated "jug store" milk dealers,[1] Garden State Farms, Inc. (Garden State)

---

[1]"Vertically integrated 'jug store' milk dealers" constitute, for present purposes, retail milk sellers who purchase raw milk directly from producers, operate their own plants where the milk is processed and packaged, and sell it in their own stores to householders on a cash and carry basis. Most such sales are in half-gallon and gallon containers of various types. Such stores also carry a limited line of other foods and household items. They are to be contrasted with other retail milk sellers — large supermarkets, small independent grocery

and Cumberland Farms of New Jersey, Inc. (Cumberland) together with its subsidiary Burlington Food Store, Inc. (Burlington). The appeals were taken to the Appellate Division, *R.* 2:2–3(a)(2), *N. J. S. A.* 4:12A–12, but certified on our own motion before argument there. *R.* 2:12–1.

The principal issues raised concern the current legal viability of the authority to fix prices at all and, if there is, the validity of the minimums fixed by Order 69–1. The latter contention amounts to a claim that the prescribed prices are too high in the light of the appellants' method of operation and asserted lower costs and that any regulation of prices should not go beyond prohibition of sales below the particular seller's costs or, if prices are to be fixed, that the minimum should be based upon the costs of the lowest cost seller, *viz.*, the lowest cost vertically integrated "jug store" dealer. Appellants' contentions are not exactly the same. Both rely primarily upon the first issue noted above. The second contention is advanced by Cumberland, but Garden State's analogous points actually boil down to substantially the same proposition, *i. e.*, that vertically integrated "jug store" dealers should, in effect, be treated separately and differently as far as resale price regulation is concerned.

Promulgation of the order was preceded by the required public hearings. *N. J. S .A.* 4:12A–23. They were called by the then Director at the instigation of certain segments of the industry (not appellants) who sought higher minimum prices than those prescribed by the price order (Order 64–1) then in effect. Various interested parties made proposals for consideration. Appellants submitted proposals which amounted in substance to the issues they now raise. The consequence was exceedingly lengthy hearings, producing some 7000 pages of testimony and more than 150 exhibits.

---

stores and unintegrated dairy stores — who do not process the milk they sell, but purchase it from wholesale milk dealers (processors-handlers) or subdealers, as well as with other forms of retail distribution — vending machines and home delivery routes.

Evidence of many points of view as to price regulation was presented by those involved in the milk industry, as well as expert testimony by leading agricultural economists, some called by the Director and others by parties in interest, going deeply into the economics and functioning of milk marketing and into very intricate cost figures.

When the matter first came on for argument before us in March 1970, we determined, in the light of the sweep and fundamental nature of the contentions advanced by appellants, that neither the record nor the findings of fact and determination of the then Director were adequate to properly consider and decide the issues. We, therefore, after consultation with the parties, ordered a remand for a further record to be made before the Director, to be returned to us with additional findings on specific questions, which we propounded, directly related to the issues which had been advanced. Further lengthy hearings were held, very protracted by reason of the appointment of a new Director and other causes beyond our control, which resulted in about 5500 more pages of testimony and 125 additional exhibits. The testimony included experiences with various kinds of milk price control, or the absence of it, in other states. The present Director has submitted additional findings based on the entire record and the case has been fully reargued.

I

*Order 69–1 and Its Background*

The order under review fixed minimum prices at only the one point of retail sale of fluid milk to the consumer. The same minimum was established whether the milk was sold through stores (without regard to the type of store or method of distribution) and vending machines for off-premises consumption or by home delivery routes. Contrary to earlier price-fixing orders, no minimums were prescribed for wholesale sales to dealers, subdealers, stores or at other points in the producing, processing or distributing chain.

Separate minimums were set forth with respect to consumer sales in quarts, half- gallon, gallon and larger containers, but without variation as to whether the container was glass, paper or plastic or whether the quantities above a quart were packaged in a single-wall container or by banding together smaller sized containers.

In prescribing only minimum resale prices at the single point of the retail sale and in arriving at those prices, the Director adopted the "single minimum margin" concept. The "single" aspect of this concept has reference to fixing a minimum price only at one point, here that of retail sale. The "minimum margin" aspect involves the fixing of a floor price by adding to the federal producer price a margin determined from the evidence to represent the composite costs of a number of low-cost, efficient operators (including vertically integrated "jug store" dealers) capable of supplying a substantial portion of the market. These costs consisted of two main segments—unit costs of processing, handling and delivery to the retail seller and a percentage of the retail price to cover in-store costs. Nothing was allowed for a return on capital investment.

The design of the scheme was intended to best achieve the statutory purpose of milk pricing regulations as the Director viewed it, *viz.*, to protect the public interest by assuring an adequate supply of fresh wholesome milk to the consumer at fair and reasonable prices through the various methods of retail distribution and sale which might be available at the choice of consumers. The theory was that most milk would sell at retail above the minimum at prices to be fixed by competitive market conditions. The Director conceived the minimum as only a floor to prevent the downward spiraling of milk prices to unreasonably low levels which he said would adversely affect the stability of the market and the industry and ultimately redound to the detriment of producers, processors and wholesale dealers, retail sellers and consumers.

These minimum prices were set forth in two different schedules—one applying to North Jersey and one to South Jersey. The reason for this is found in the method by which New Jersey milk producers are now paid for their milk. Producer prices are fixed, not at the state level, but by federal marketing administrators under federal milk marketing orders pursuant to federal statutes. New Jersey is subject to two differing federal marketing orders. North Jersey is included, since 1957, in Order No. 2 covering the entire New York area; South Jersey is, since 1963, under Order No. 4 covering it and areas in adjacent states to the south and west. (Before these dates New Jersey producer prices were fixed by the state milk control agency.) Producer prices per cwt. are fixed by the federal administrators, monthly,[2] according to formulae on the basis that all producers in the marketing area receive a uniform blend price for their milk regardless of the kind of utilization by the particular processor-handler, *i. e.,* without differentiation as to the proportion of that handler's milk used for fluid consumption (Class I, commanding a higher price in the market) or for manufacturing purposes (Class II, ice cream, butter, cheese, powder and the like). The formula differs as between the two federal orders affecting New Jersey by reason of a variance in the allocation of transportation charges from farm to processing plant as between producer and processor, so that the producer price is not the same in the two regions of the State. Since the minimum prices fixed by Order 69–1 are composed, as we have said, of an additive to the producer price, which additive consequently differs in the two sections of the state, separate minimum price schedules—in effect dif-

---

[2]Monthly price changes are largely made necessary by reason of seasonal fluctuations in the available supply of milk, with the greatest production (and so the lowest price) in the late spring of the year and the least production (and the highest price) in the late fall.

fering but slightly—are required for North and South Jersey.

Order 69–1 also provides, by schedules, that the minimum prices shall increase or decrease monthly each time federal producer prices change at least 19 cents per cwt. (This has been a characteristic of New Jersey milk pricing orders since 1960.)

The order, intended to take effect June 3, 1969, was to supersede Order 64–1, which became effective March 31, 1964. Order 64–1 was structurally similar, being based on the minimum margin concept, but it also fixed minimum, prices for sales into stores, sales to subdealers and sales by home delivery and the range for change in prices to accommodate changes in federal producer prices was 23 cents per cwt. instead of 19 cents. The effect of Order 69–1 was stayed pending the outcome of these appeals, as was any upward adjustment based on increases in producer prices. The effect has been to freeze minimum prices fixed by Order 64–1 at the level of the producer price at the time of the stays in 1969. We understand this has resulted in out-of-store minimum prices having remained at 28 cents per quart, 51 cents per half-gallon and 96 cents per gallon.

We also understand, since the Director denied proposals to increase the minimums over those for out-of-store sales in Order 64–1, that the minimums in Order 69–1 are substantially the same as in the prior order, although computation of the figures making up the minimum prices is involved and difficult to comprehend. It is apparent, however, that, were Order 69–1 to become effective today, the minimum retail prices would be some pennies higher as to each size container than the frozen prices above set forth by reason of fairly substantial increases in federal producer prices in the interim. It further should be noted that no interested party other than Garden State and Cumberland appealed Order 69–1 and in fact several have participated before us in support of the order.

Some fairly recent history of milk distribution and regulation in this state should be in mind to put the issues before us in sharper focus. Prior to 1960 fluid milk had largely been sold to New Jersey consumers in glass quart bottles through grocery stores and home delivery, with distribution to these outlets in the hands of wholesale dealers and processors who bought from producers. Prices prescribed by the milk control agency, as they had since the original imposition of controls many years before, related to every step in this conventional distributive process—"across-the-board"—and were generally thought to be high and geared to the idea that the minimum prices fixed would also represent the price charged. There was a pervasive feeling that the prices fixed were intended to or had the effect of subsidizing and maintaining various components of this process, as well as restricting competition and inhibiting new methods of distribution. Beginning in 1960 the vertically integrated chain "jug store" dealer made his appearance, pioneered by Garden State and a few others and soon joined by Cumberland. They stressed the sale of milk in specialized stores (see footnote (1)) by the half-gallon and gallon (first in returnable glass containers requiring a deposit and in later years in nonreusable paper and plastic containers), which they claimed could be sold at retail at a profit for less than the minimum. As this method of retail milk sale achieved consumer popularity and the number of "jug stores" increased, supermarkets and other stores turned to selling milk in half-gallons and gallons, consumers bought their milk in such quantities when they purchased their groceries, and home delivery, which always carried a higher price, declined markedly. Today, (we speak as of the time of the remand hearings in this case) vertically integrated retailers (including one supermarket chain doing its own processing) sell something over a fifth of the milk retailed in this state and the half-gallon container has become the most popular size in all stores.

The advent of the "jug store" increased the dissatisfaction with the "across-the-board" method of strict milk price regulation. The situation came to a head following Order 60–1, to be effective April 1, 1961, which raised minimum prices "across-the-board" on the basis of a composite profit and loss statement of 12 conventional milk wholesalers. The order was attacked by Garden State and other vertically integrated jug dealers for failure to take their lower costs into account and was twice set aside by this court on their appeals. *Lampert Dairy Farm, Inc. v. Hoffman,* 35 *N. J.* 205 (1961) (*Lampert* I) and *Lampert Dairy Farm, Inc. v. Hoffman,* 37 *N. J.* 598 (1962) (*Lampert* II). In the second decision we said:

> Order 60–4 substantially and uniformly raises price minimums. Since much of the milk delivered to homes in quart containers has been selling at more than the minimums established under Order 60–1, while much of the milk sold in stores in quarts or packaged in the larger containers has apparently been selling at those minimums, Order 60–4 is likely to further limit any economies the consumer can achieve by purchasing at stores in either quarts or larger containers. Before we can properly sanction such a result there must be evidence to support the conclusion that the method of distribution or type of container is not subsidized at the expense of another unless the record discloses the subsidy and the extent thereof is justifiable in light of the statutory objective. (37 *N. J.* at 605)

and remanded the matter to the Director to hold further hearings and present and take evidence "as to cost factors consistently associated with the various methods of distribution and container sizes." *Id.*

Shortly after this opinion was filed, the Governor appointed a milk study commission to probe into the causes of dissatisfaction with the state's milk control program. Upon receiving the commission's report in October 1962, the agency, at the direction of the Governor, suspended all resale price control. Prices dropped considerably and evidence of disruption began to appear in the industry. Some weeks later the Legislature passed an emergency milk control law (*L.* 1962, c. 182, later extended by L. 1963, c. 165) em-

powering the Director to establish, for a limited period, temporary resale prices without hearing, which he did. The object was to prevent destructive price wars and unfair competition pending determination of costs and appropriate future regulation in the light of current conditions in the industry. To assist in this task, Case and Company, management consultants, were employed by the Secretary of Agriculture to make cost-of-operations studies and an advisory committee of eminent agricultural economists (Professors Aplin, Carncross, Johnson, Markham and Pierce) was commissioned to study and recommend future economic regulatory programs for the industry in the state.

The economists' report is a most comprehensive study of the industry, changes that had taken place, some of which we have already noted, and the resulting situation. It has present pertinency because the theory of Orders 64–1 and 69–1 was based upon it. (It was introduced in evidence at the hearings on Order 69–1 and several of the authors testified.) The unanimous conclusion of the report was that New Jersey should abandon its long-standing policy of detailed, "across-the-board," fixed differential, resale price-fixing restrictive of competition, and change to a system permitting greater price competition, in all sectors of the industry beyond the producers' level, in the ultimate best interest of producers, distributors and consumers. They advised against a system of no regulation of resale prices and trade practices as disruptive of the orderly competitive process and imposing undue hardships on legitimate, efficient enterprises engaged in the processing and distribution of milk. They suggested as specific objectives for a state regulatory program: as to dairy farmers, a continued market should be provided for that milk which can be produced on New Jersey farms at a cost competitive with milk from outside the state; as to milk distributors, they should be protected from unfair competitive practices such as unreasonably low prices by

any dealer, unjustifiable price discrimination and disruptive methods of competition such as the granting of hidden price cuts; and as to consumers, they should have the lower price benefit of greater efficiency in milk marketing and the development of low-cost distribution systems, which would also benefit both farmers and distributors by keeping fresh fluid milk as competitive as possible with substitutes. And any regulatory program must be capable of equitable and effective administration.

The economists were not in agreement as to the method of ultimate implementation of the thesis and objectives. There was a consensus, however, that a transitional program was needed to adjust from the former restrictive "across-the-board" price policy to a long-run method of much freer competition. There was general agreement that during the adjustment period, certain minimum margin prices should be fixed at certain key points in the distributive chain based on the cost of raw milk plus the average cost of low-cost distributors capable of making available a significant quantity of milk at the specified point in the marketing channel. As to the ultimate method, two of the economists favored a program prohibiting sales below the least cost firm in the market, combined with a prohibition on unfair methods of competition and price discrimination. Two proposed a single minimum margin price (fixed as just described) only for whole fluid milk at the point of sale to the consumer. They rejected the sales-below-cost theory as too difficult for effective enforcement. (They were joined at the original hearing on Order 69–1 by one of the two who had first favored the approach of prohibition of sales below cost, on the ground of the favorable experience under Order 64–1). The fifth man advocated more or less indefinite continuation of the proposed transitional program of minimum margin prices at key points. All agreed that separate minimum retail prices should not be fixed for home delivery. All also agreed that the method of long-run regulation to be utilized is a matter of judgment.

The promulgation of Order 64–1 shortly followed the economists' and the Case and Company reports. The order, by its language, was intended to provide the period of adjustment recommended by the economists and adopted the minimum margin concept of key-point pricing by size (but not kind) of container at the points of wholesale sales to stores, sales to subdealers and sales out-of-stores, as well as home delivery (which the economists had recommended against). The rationale, like that which undergirded the economists' report, was that the minimums were intended only as floor prices to prevent destructive price competition, that most milk would sell above the minimums at prices determined by orderly competitive conditions, that low-cost methods of distribution would not be inhibited, and that consumers would have a choice of outlets and means of obtaining their household milk supply. Order 64–1 was sustained by this court, as against the contentions then raised by Cumberland and Burlington, in *Burlington Food Store, Inc. v. Hoffman,* 45 *N. J.* 214 (1965).

Order 69–1, as we view it, with its single minimum margin price at the point of sale to the consumer, represents the commencement of a long-range program of even freer competition after the period of adjustment. The evidence at the hearings preceding it and on the remand, including the testimony of two of the economists, demonstrated that the transitional program of Order 64–1 had been successful and the results had been generally as predicted. Prices to a considerable degree had been left to market forces. Only Cumberland, and sporadically a few other retailers, had sold to the consumer at the minimum. Consumers generally had enjoyed the benefit of milk prices lower than under orders prior to the lifting of all controls in 1962. Efficiencies appeared to have been adopted by processors and wholesale dealers and the low-cost vertically integrated distribution system had

grown substantially. All in all, reasonably orderly and fair market conditions had been achieved.[3]

## II

### *The Current Viability of Price Regulations Under the Milk Control Law*

Appellants contend that the purpose of our milk control law was to assure an adequate supply of milk to consumers only by providing a reasonable return to producers and that such return is now assured by the federal marketing orders fixing prices paid to producers. The argument therefore runs that fixing minimum prices to consumers no longer has any real or substantial relationship to any legitimate public purpose and not only exceeds the statutory authority, but is beyond the valid exercise of the police power. The contention is thus couched in terms both of the scope of the statute and of the constitutional guarantees of due process and equal protection. The two prongs of the argument essentially mesh.

At this late date it cannot be disputed that the business of producing and distributing milk is affected with a public interest and subject to governmental regulation, including price-fixing, provided, of course, the particular regulation is substantially related to a legitimate end sought to be attained. *Abbotts Dairies, Inc. v. Armstrong,* 14 *N. J.* 319, 330 (1954), and cases therein cited. All stages of the business can be regulated pursuant to this basic principle. The primary question is the purpose and intended scope of our statute, to which we turn.

---

[3]It did appear from the testimony that wholesalers charge higher prices to retailers in urban ghetto areas, where vertically integrated jug stores do not operate, than in suburban areas, where there is intense competition between them and conventional retail outlets. The result is that consumers least able to pay for milk are charged higher prices. The Director's reply brief after remand indicated that an anti-discrimination regulation appeared needed to correct this inequity. We are not advised whether this salutary action has been taken, as it should be.

The current law was enacted as *L.* 1941, c. 274, *N. J. S. A.* 4:12A–1 *et seq.,* and has since remained practically unchanged in its substantive provisions.[4] There is no doubt that the statute and its predecessors grew out of an emergency which developed prior to 1933—the fact that dairy farmers in the state, who were not then protected by federal marketing orders, were at the mercy of processors and handlers and were receiving less for their milk than the cost of production, threatening ruin to producers and a consequent diminution in the supply of milk for consumers. The immediate aim of the law and the prior acts was to set up a state governmental agency with authority to fix prices and enact other regulations to rectify this evil. The preamble to the 1941 Act, *L.* 1941, c. 274, p. 713, *N. J. S. A.* Title 4, pp. 282–283, as had the preliminary recitals in the earlier statutes, spoke in these terms.

■ But study of the entire 1941 act clearly demonstrates that it was designed and intended to be a permanent measure authorizing regulation of all aspects of the industry as the agency might determine from time to time to be necessary or advisable for the benefit of all interested in the production, distribution, sale or consumption of milk.

■ Both the preamble and section 52 of the act, *N. J. S. A.* 4:12A–52 so indicate, the latter stating:

This act shall be effective until such date as the Legislature shall determine an emergency no longer exists and the exercise of the police power of the State is no longer necessary and shall terminate its operation.

While it is plain enough "that 'a statute valid when enacted may become invalid by a change in conditions to which it is applied'" and "'a law depending upon the existence of an emergency, or other certain state of facts, to uphold it, may

---

[4]The act succeeded earlier temporary milk control laws, each of which expired by time limitations contained therein. *L.* 1933, c. 169; *L.* 1935, c. 175; *L.* 1937, c. 56; *L.* 1939, c. 82.

cease to operate if the emergency ceases, or the facts change, even though valid when passed,'" *Garden State Dairies of Vineland, Inc. v. Sills,* 53 *N. J.* 71, 75–76 (1968), a court should be most hesitant to so conclude when the Legislature has been as strongly positive as it has been here concerning the termination of the efficacy of a statute. And it is equally plain doctrine that while a police power act may be conceived by an emergency, that emergency may bring to light weakness in a system which requires permanent application of what was adopted as emergency legislation. A current emergency may be different in kind from that existing at the time of enactment, *Como Farms, Inc. v. Foran,* 6 *N. J. Super.* 306, 314 (App. Div. 1950) (speaking of this very law), and it does not follow that the Legislature intended to restrict action to the original evil alone. *See Abbotts Dairies v. Armstrong, supra* (14 *N. J.* at 325) again speaking of the 1941 act.

That the Legislature intended the 1941 law to have a wide and lasting scope, far beyond the mere financial protection of producers, is best shown by section 21, *N. J. S. A.* 4:12A–21, broadly and comprehensively enumerating the powers of the Director. Its language speaks for itself in this connection and cannot be stressed too strongly:

> The director may fix the price at which milk is to be bought, sold, or distributed; regulate conditions and terms of sale; establish and require observance of fair trade practices; supervise, regulate and control the entire milk industry of the State of New Jersey, including the production, importation, classification, processing, transportation, disposal, sale or resale, storage or distribution of milk as defined in this act in the State of New Jersey in those matters and in every way necessary to carry out the purposes of this act and necessary to control or prevent unfair, unjust, destructive or demoralizing practices which are likely to result in the demoralization of agricultural interest in this State engaged in the production of milk *or* interfere with the maintenance of a fresh, wholesome supply of sanitary milk for the consumers of this State . . . . (emphasis supplied)

We construe these wide powers to amount to an expression of legislative intent that the scope of the statute and

the powers of the Director shall extend, for an indefinite time, to regulation of all aspects of the milk industry in this state, far beyond the mere protection of producers, and including the maintenance at all stages of an economically healthy and orderly industry and consideration of the welfare of consumers. Indeed, the underlying rationale of our earlier cases supports the view that the intended purpose and scope of the statute includes consumer protection and benefit. *See e. g. Abbotts Dairies v. Armstrong, supra* (14 *N. J.* 319) (sustaining maximum resale prices); *Lampert I, supra* (35 *N. J.* 205); *Lampert II, supra* (37 *N. J.* 598).

We read the last phrase of the quoted section—"maintenance of a fresh wholesome supply of sanitary milk for the consumers of this State"—to encompass the availability of such a supply at fair and reasonable prices and with a reasonable choice of competitive and convenient places and methods of purchase—supermarkets, small independent grocery stores, vertically integrated and other specialized dairy stores, vending machines and home delivery. Fixing of minimum floor prices for retail sales under Order 69-1 certainly falls within the statutory scope.

We further conclude that these objectives of the statute and their implementation by agency orders and regulations are substantially related to a legitimate end. It follows that the statutory powers of the Director as so construed represent a constitutional legislative exercise of the police power. We cannot agree with appellants' contention that statutory price-fixing powers are limited to providing a reasonable return to producers and that price regulation is no longer legally viable because that objective has been attained by the federal marketing orders blanketing the state. Also, the mere fact that some states have done away with milk control and price regulation in whole or in part or exercise controls in a different way does not render our system and legislation invalid. The Legislature is entitled to make the choice as to whether it will regulate the milk industry and, if so, how, so long as the system adopted is not arbitrary and

violative of due process. It appears to us that the regulatory scheme empowered by the 1941 statute still clearly passes muster in 1972.

Moreover, even if the price-fixing powers were as circumscribed as appellants urge, we are convinced that the Director could properly find from the evidence, as he did, that the federal marketing orders do not fully protect New Jersey producers economically and that they are benefited by price regulations like Order 69–1. A few instances may be briefly noted. The federal orders do not guarantee the producer a market for his milk, nor a stable and orderly distribution system to protect the market he may have, nor payment for his milk. All the orders do is to fix the monthly blend price he is due to receive from his handler, directly or through an operating cooperative. The New Jersey dairy farmer is interested in having as much of his milk as possible used for fluid consumption for that increases the blend price. Increase in per capita consumption is stimulated by consumer prices reasonably low, but high enough to keep processors and handlers in business. By the same token, prosperous wholesalers furnish a steady market and they are able to pay the farmer; a number of recent distributor failures in this state have caused substantial producer losses. Distressed handlers may be forced to charge the farmer for haulage and handling and avoid the payment of premiums, thus reducing his take. Many New Jersey farmers belong to operating cooperatives, who must negotiate many items with handlers; if the handler is not financially sound the cooperative cannot meet its operational costs without paying its farmer-members less than the federally fixed price. All in all, the farmer benefits from a stable and orderly processing and distribution system, which regulations like Order 69–1 are designed to bring about. What can happen to the producer when there are no price controls is demonstrated by the situation which quickly developed when all resale price regulation was suspended in 1962. Heavy price-cutting led handlers to look for cheaper

milk in distant states and New Jersey dairymen were
threatened with loss of their markets.

## III

### *The Validity of the Provisions of Order 69–1*

Appellants' second main argument is, in effect, that, even
asuming the present legality of price-fixing, the precise pro-
visions of Order 69–1 are invalid as setting too high min-
imums and as discriminatory against vertically integrated
"jug store" dealers in view of their method operation and
claimed lower costs.

The scope of judicial review of a milk price-fixing
order is now well defined. Although the fixing of prices is to
prescribe future conduct and so may be said to constitute
rule-making and thus be "legislative" in nature, the Legisla-
ture in section 23 of the 1941 act as amended by *L.* 1952,
c. 159, *N. J. S. A.* 4:12A–23, specified that the Director must
hold a public hearing before fixing or refixing any price and
that he "shall issue findings of fact and an order based upon
the evidence adduced at said hearing." We have interpreted
this to require judicial review as if the administrative action
were "quasi-judicial" in character. *Abbotts Dairies v. Arm-
strong, supra* (14 *N. J.* at 331–333); *Garden State Farms,
Inc. v. Hoffman,* 46 *N. J.* 595, 599–600 (1966). The scope
of review in such matters is to determine " 'whether the
findings made could reasonably have been reached on suf-
ficient credible evidence present in the record,' considering
'the proofs as a whole,' with due regard to the opportunity
of the one who heard the witnesses to judge of their cred-
ibility . . . and . . . with due regard also to the agency's
expertise where such expertise is a pertinent factor." *Close
v. Kordulak Bros.,* 44 *N. J.* 589, 599 (1965). We have fur-
ther said, with respect to judicial review of milk price-fixing
orders, that "[w]e think it clear that the Legislature ex-
pected the reviewing court to do more than merely express an
abiding faith in the agency's expertise; that it wished the

court to see to it that price fixing rests upon evidence rather than upon a conclusional assertion of what the Director and his staff know or fear." *Garden State Farms, Inc. v. Hoffman, supra* (46 *N. J.* at 599–600).

In fixing milk prices, the Director must be concerned with three principal elements: whether to fix prices at all; if so, on what basis and to what extent; and what precise figures should be prescribed. The evidence here, originally and even more so on remand, probed deeply, probably more so than ever before, into all aspects of the milk industry, covering all of these elements thoroughly from all points of view. The questions involved were hotly contested, with conflicting expert and industry testimony, cost studies, experience in other states and proofs on almost every conceivable facet fully presented by the differing parties in interest. The findings of the Director, especially those after the remand, are complete and adequate on their face. The whole procedure and record is in sharp contrast to that found in several earlier cases coming from this agency where we were required to set aside price orders.

The issue before us is whether the Director's findings and order could reasonably have been reached on sufficient credible evidence present in the record. The question is not whether we would have reached the same conclusions. We think we must also consider as an integral part of the determination of this issue, whether, from the evidence, the order appears reasonably fair to all the sharply diverse interests concerned without improper favoritism to any.

In approaching this issue, it must be remembered that the milk industry is both unique and volatile. Its economics are complex and hard to understand for those not closely connected with it. As the United States Supreme Court said in *H. P. Hood and Sons v. DuMond,* 336 *U. S.* 525, 529, 69 *S. Ct.* 657, 661, 93 L. Ed. 865, 870 (1940) : ". . . the economy of the industry is so eccentric that economic controls have been found at once necessary and difficult. These have evolved detailed, intricate and comprehensive regulations, including

price-fixing." Milk is a universal food in constant public demand. It must be supplied not only to homes but to schools, hospitals and other institutions. It is produced 365 days a year, which cannot be stopped; it is a perishable commodity which must be handled and processed promptly. Profit above the producer level is measured in pennies per unit and unit costs, and thus profit, depend upon volume, which can result in sharp and destructive competition and an unstable and disorderly market. At the retail store level, milk is frequently used as a traffic builder, with emphasis on price, or even as a loss leader, there being no substantial consumer brand preference. And technological and other advances related to production, processing and distribution, in the last decade or so, which will undoubtedly continue, have brought about vast changes in the industry and its economics.

Given all these and other pertinent factors, price regulation and the details of it largely come down, as the economists' report said, to matters of judgment to be exercised by the administrative agency. The element of agency expertise enters heavily into evaluation of a price-fixing order. Judicial reliance thereon cannot be blind, however; a sufficient basis for its exercise and the resulting findings must be found in the hearing evidence. If the latter exists, due regard must be accorded expertise.

Dealing with the previously mentioned three elements which must concern an agency in considering the fixing of milk prices, it seems clear beyond any doubt that the record here adequately supports the finding of the desirability for continuing some form of price-fixing in this state. While a completely unregulated market apparently has worked satisfactorily in some other states, that fact does not require the Director, in the exercise of his expert judgment, to adopt that course.

We reach the same conclusion with respect to the basis and extent of price regulation. There was ample evidence to support the Director's decision that only a prohibition against sales below the particular seller's cost was too difficult

to effectively enforce and would most likely not be satisfactory in New Jersey. Likewise the determination to adopt the single minimum margin concept, applicable only to all sales to consumers, on the theory of a floor price to prevent destructive price-cutting, with actual prices to be dictated by orderly market competition, is fully sustained by the proofs. The Director could reasonably reach the result he did on these aspects from the evidence, especially the economists' report and the corroborative oral expert testimony.

We believe the same holds true as to the precise minimum prices he established, where expertise is an equally important factor. There was a plethora of very intricate evidence on costs and prices, including not only the Case study and supplemental material, but also later agency studies and cost figures presented by appellants.[5] Comparable cost figures are most difficult to achieve. There is no uniform method of accounting and cost evidence can speak only as of one exact point of time, subject to very quick change by reason of any number of affecting factors, especially including volume at the particular time. The opinion evidence showed that the appropriate minimums to be fixed depend not only on cost figures, but also on other factors encompassing the objectives sought to be achieved, the number and size of firms in the distributive process, prevailing market prices and the range of market prices. The Director could properly find from the proofs that minimums should not be fixed based on the costs of the lowest cost operator, else the yardstick would be the

---

[5]Appellants' figures, particularly those of Cumberland, sought to show ability to sell at a profit below the minimums then in existence (and those ultimately fixed). Probing of the detail making up those figures on cross-examination was substantially blocked by claims of confidentiality. (There was also some evidence that vertically integrated "jug stores" sold non-dairy merchandise at prices higher than neighboring stores of other kinds.) The Director expressly found "that dairy stores are *not* able to sell to consumers at costs below those which other modes of distribution can achieve." We consider the situation, however, as if appellants' figures did demonstrate slightly lower costs.

costs of the producer selling his own milk directly to consumers, nor that the costs chosen should be those of a single specialized dealer with a low cost container and method of operation, else the price thus set would in effect be set at a disaster level for all other dealers. There was ample credible evidence in the record for the Director's conclusion that the minimums he prescribed should be based, to the extent costs are considered in setting prices, on the costs of several low cost efficient operators (including vertically integrated dairy stores) capable of supplying a substantial portion of the market, regardless of the kind of container or the exact method of operation. Nothing in the statute dictates otherwise.

We should add that we consider the objectives sought to be achieved by the prices as so fixed to be entirely justified and legitimate, within the statutory scope and fully supported by the proofs. Added financial support to the New Jersey dairy farmer is specifically set forth as a statutory purpose. The maintenance of a stable and orderly market and the availability to the consumer of alternative methods of purchase at fair and reasonable prices bear on the statutory objective of "the maintenance of a fresh, wholesome supply of sanitary milk for the consumers of this State." As one expert testified at the remand hearing:

Certainly you can have an adequate supply of milk in the farming areas and if you don't have sufficient returns for the businessmen to assemble the milk, process it and distribute it, you don't really have an adequate supply to all consumers.

In summary, we find the procedure leading to Order 69–1 to be fair, and the order itself to be reasonable with respect to all the diverse interests involved in the milk industry as a business affected with a public interest (except in two minor aspects to be mentioned). While it represents the commencement of a novel and different long range approach to milk price regulation in this state, it is not to be considered as the be-all and end-all. Continuous reevaluation

by the agency, and amendment of the order as changed economic and other factors dictate, is certainly called for.

The two aspects of the findings of the Director on remand requiring special note derive from his own recomputation and reevaluation of the original findings of his predecessor. He prepared new worksheets to arrive at minimum prices by a slightly different process and so proposed a revised order. This went beyond the intended purpose and scope of the remand. However, he arrived at the same minimums as in the original findings with two exceptions.

As to the first of these, the original order provided no different minimums when half-gallon and gallon containers were made up of banded smaller containers as against single-wall containers. The findings on remand proposed a higher minimum for banded containers. This led to the intervention on this appeal after the return of the remand of intervenor-appellant Dairy Stores, Inc. to urge that such revised minimums should not be ordered. We agree. No party in interest appealed from this portion of the original order, no notice was given by the Director that such a proposal would be considered on the remand and no opportunity to appear and offer evidence in opposition was afforded. This proposed revision of the original order, therefore, cannot be allowed.

The second change proposed in the original order by the findings on remand related to minimum resale prices for larger than gallon containers. The original order prescribed that the minimum for such containers should be "the quart equivalent of the minimum price for gallon containers, multiplied by the number of quarts in the unit." Cumberland, the only dealer using such containers, urged in its original brief that this price was erroneous. The Director, on remand, agreed and proposed that the minimum therefor should be "the quart equivalent of the minimum price for gallon containers minus one cent per quart multiplied by the number of quarts in the unit." We concur, on the basis of

the evidence of lesser costs in connection with such larger containers; the minimum originally fixed therefor was arbitrary.

Our conclusion therefore is that Order 69–1 as originally promulgated, with the modification as to the minimum prices for larger than gallon containers just noted, is affirmed, to become effective on a date to be fixed by the Director. No costs to any party.

*For affirmance*—Chief Justice Weintraub and Justices JACOBS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—6.

*For reversal*—None.