**FARMLAND DAIRIES and Fair Lawn Dairies, Inc., Plaintiffs,**

v.

**COMMISSIONER OF the NEW YORK STATE DEPARTMENT OF AGRICULTURE AND MARKETS, and Joseph Gerace, Former Commissioner of New York State Department of Agriculture and Markets, Defendants.**

No. CV 86–1933.

United States District Court, E.D. New York.

Jan. 8, 1987.

Friedman & Wittenstein by Andrew A. Wittenstein, New York City, for plaintiffs.

Robert Abrams, New York State Atty. Gen. by Barrie L. Goldstein, Dept. of Law, New York City, for defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

The founding fathers of this nation recognized the importance of maintaining a federal watch over the flow of interstate commerce, lest the desire of each state to further itself economically without regard to the consequences suffered by a sister state lead inevitably to destructive divisiveness between the several states. This concern overrode even the fear that individual states would lose their power and independence to the strong federal union. It was apparent at the time the United States Constitution was adopted that the states' surrender of power to regulate interstate commerce was essential for the development of this country as a viable, enduring entity capable of taking its place as a great force among the other nations. To avoid the outbreak of economic warfare between the states and ensure this nation's ability to function as a united sovereign, the power to regulate matters of interstate commerce was vested in congress through the commerce clause of the Constitution. The significance and necessity of the protections provided by the commerce clause remain equally apparent today, as this nation prepares to celebrate the bicentennial of the Constitution's adoption. The commerce clause continues to be one of the most plenary sources of federal power, as well as the cause of a multitude of state and federal litigation.

New York dairy legislation has been a familiar player in commerce clause litigation. In the present case, Farmland Dairies and Fairlawn Dairies, Inc. (collectively "Farmland"), two New Jersey companies, are challenging the application of § 258–c of the New York Agriculture and Markets Law to plaintiffs' request for an extension of their licenses to distribute milk in New York State to include New York, Bronx, Kings, and Queens Counties.[1] Farmland originally commenced this lawsuit against Joseph Gerace, individually and in his official capacity as the Commissioner of the New York State Department of Agriculture and Markets, seeking damages, and equitable and declaratory relief for actions allegedly in violation of the commerce clause. On January 2, 1987, however, Gerace resigned from his post as Commissioner. Farmland has indicated its desire to pursue its action for damages against Gerace in his individual capacity, but any claims brought against Gerace in his official capacity as Commissioner must now run against his successor, since upon a public official's resignation, his successor is automatically substituted as a party. Fed. R.Civ.P. 25(d).[2]

Defendants now move, by way of a summary judgment motion, for a declaration that Farmland's commerce clause claim is moot, and that its claim for damages is barred by the eleventh amendment to the Constitution or, alternatively, by the doctrine of official immunity. Farmland cross-moves for summary judgment in the form of an order declaring Gerace's application of § 258–c to Farmland's license request to be in violation of the commerce clause of the Constitution and for a preliminary and permanent injunction against the Commissioner from so applying the statute.

### I. FARMLAND'S COMMERCE CLAUSE CLAIM

Section 258–c provides in pertinent part:

by the Court against the Commissioner in his official capacity shall be enforceable against the individual chosen to take on the Commissioner's responsibilities, either on an acting or permanent basis.

---

1. Farmland is presently licensed to distribute milk in New York State in Orange, Richmond, Rockland, and Westchester Counties.

2. To date, no one has been named to succeed Gerace as Commissioner. Any relief awarded

No license shall be denied to a person not now engaged in business as a milk dealer, or for the continuation of a now existing business ... unless the commissioner finds by a preponderance of the evidence ... that the issuance of the license will tend to a destructive competition in a market already adequately served; or ... that the issuance of the license is not in the public interest.

N.Y.Agric. & Mkts.Law § 258–c (McKinney 1972 and Supp.1987). Farmland contends that Gerace used § 258–c as a vehicle to delay and ultimately prevent Farmland from becoming a market participant in the four New York State counties to which its applications pertain. As the material facts concerning Farmland's commerce cause claim are not in dispute, this issue is ripe for a final adjudication on the merits. Fed. R.Civ.P. 56.

█ The commerce clause states, "The Congress shall have the power ... to regulate Commerce with foreign Nations, and among the several States, and with Indian Tribes." U.S.CONST. art. I, § 8, cl. 3. In considering whether state legislation is violative of the commerce clause, a court must determine if the state law constitutes "economic protectionism." *Minnesota v. Clover Leaf Creamery*, 449 U.S. 456, 471 n. 15, 101 S.Ct. 715, 727 n. 15, 66 L.Ed.2d 659, *reh'g denied*, 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981) (citing *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978)). Economic protectionism exists where the challenged state legislation was promulgated for the purpose of discriminating against articles that travel in interstate commerce, *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 352–53, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977), or where the legislation, although valid in its purpose, has a discriminatory effect on interstate commerce, *City of Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2535. Where either mode of discrimination is found, there is a "virtually *per se* rule of invalidity." *Id.* Even a statute that is designed to effectuate "even handedly" a legitimate state policy and has only an "incidental" effect on the flow of commerce may not withstand challenge "if the burden imposed on commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

## A. PURPOSE

█ The Court's first inquiry is whether the purpose of § 258–c, or more precisely, the purpose of Gerace's actions that Farmland now challenges, was to discriminate against articles that travel in interstate commerce.[3] A decision by a commissioner to deny an applicant entry into the New York milk market is obviously designed, at least in part, to regulate the inflow of milk into the state. However, although the commerce clause vests in congress the power to regulate interstate commerce, it does not place an absolute prohibition on states from promulgating or enforcing laws that do the same. *H.P. Hood & Sons v. DuMond*, 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949). The Supreme Court has recognized the health and safety of state inhabitants as a legitimate concern upon which laws regulating interstate commerce may be based. *Id.*, 336 U.S. at 532, 69 S.Ct. at 662. *See also, e.g., Raymond Motor Transportation Inc. v. Rice*, 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978); *Great A & P Tea Co. v. Cottrell*, 424 U.S. 366, 371, 96 S.Ct. 923, 927, 47 L.Ed.2d 55 (1976). The Court has consistently made clear, nonetheless, that state action designed to place one state in a

---

**3.** Commerce clause litigation often takes the form of a challenge to a state statute where one party wants the court to declare the entire legislation invalid because either its purpose or effect is to impede interstate commerce. Here, however, the challenge is not to the constitutionality of § 258–c itself, but rather the manner in which Gerace applied it to Farmland's applications, The focus of the Court's inquiry, therefore, is on the purpose underlying the way in which Gerace enforced § 258–c as against Farmland, as opposed to the purpose underlying the statute's enactment.

position of economic isolation from or economic advantage over other states is violative of the commerce clause. *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980); *Hunt,* 432 U.S. at 350, 97 S.Ct. at 2445.

In denying Farmland an extension of its license to allow it to sell milk in New York, Bronx, Kings, and Queens Counties, Gerace found, in a determination handed down on December 11, 1986, that Farmland's entry into the market would "tend to a destructive competition in markets already adequately served and would not be in the public interest." Commissioner's Determination, State of New York Department of Agriculture and Markets 21 (Dec. 11, 1986). In reaching this decision, Gerace found that substantial competition between New York milk dealers already exists and that Farmland's presence in the market would intensify competition such that processors and distributors would weaken financially. The former Commissioner concluded that the New York market is at present adequately served and that the addition of yet another competitor would result in prior dealers being pushed out of the market.

■ It is clear from Gerace's report that his decision to deny Farmland's license applications was based on economic protectionism. Regardless of whether it be to prevent the New York milk dealers from losing revenue to a New Jersey dealer or rooted in concern that an adequate supply of milk be available for New York consumers, the purpose underlying the Commissioner's determination is discriminatory. Economic protectionism is not restricted to governmental decisions designed to advance the interests of in-state producers but extends as well to actions that favor the needs of in-state consumers for an adequate supply of goods over those of out-of-state consumers. *Hood,* 336 U.S. at 535–36, 69 S.Ct. at 664. A state statute, regulation, or other governmental decision can withstand commerce clause challenge only if it is properly grounded on a legitimate health or safety concern. *Id.* Any relationship between the purpose espoused by Gerace, *i.e.,* controlling competition, and a health or safety concern, such as ensuring the quality and wholesomeness of milk sold in New York, is tenuous at best, and does not warrant the burden that denying Farmland entry into the New York market places on interstate commerce. *See Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935).

The Court's conclusion that the purpose underlying Gerace's denial of Farmland's license was discriminatory and runs afoul of the commerce clause is supported by the decision in *Safeway Stores, Inc. v. Board of Agriculture of the State of Hawaii,* 590 F.Supp. 778 (D.Hawaii 1984), a case remarkably similar to the one before this Court. *Safeway* involved an application by an out-of-state company to the Hawaii Board of Agriculture ("Board") for a license to distribute milk products in that state. The license was denied pursuant to a regulation almost identical to the one at issue here. The Board found that granting the license would promote destructive competition in a market already adequately served. In *Safeway,* Judge Pence examined the Board's decision, found it was an effort to protect the local Hawaii dairies from out-of-state competition, and granted summary judgment declaring the Board's denial a *per se* violation of the commerce clause.[4]

In finding that the Board's purpose was in conflict with the commerce clause, and thus a *per se* violation, the *Safeway* court relied heavily on the Supreme Court's opinion in *Hood,* 336 U.S. 525, 69 S.Ct. 657.

---

4. Although the *Safeway* Court concluded that there was sufficient support to invalidate the statute itself, it refrained from so doing, finding that "considerations of comity suggest that a federal court should not paint with too broad a brush on the canvas of state agricultural regulation." 590 F.Supp. at 736. Similarly, a decision

by this Court striking down § 258–c would not be without foundation. This Court will, however, leave such a broad stroke to the discretion of the state legislature. The Court, therefore, decides only the constitutionality of Gerace's application of § 258–c to Farmland in this case.

*Hood* involved a denial by the New York Commissioner of Agriculture and Markets, pursuant to a predecessor statute to § 258–c,[5] of Hood's application to establish an additional receiving depot within New York State at which to receive and ship into interstate commerce milk from farmer-producers. In denying Hood's application, the Commissioner stated that if Hood were allowed to open an additional facility, milk previously sent to existing plants would be diverted to the new facility, possibly causing a shortage of milk in the New York market. He concluded, therefore, as did Gerace in the instant case, that granting the license would " 'tend to a destructive competition in a market already adequately served, and would not be in the public interest.' " 336 U.S. at 529, 69 S.Ct. at 660.

The Supreme Court struck down the application of the statute in *Hood,* holding that the Commissioner's denial of Hood's license violated the commerce clause. In its examination of the Commissioner's purpose in denying the license, the *Hood* Court looked to its earlier decision in *Baldwin,* 294 U.S. 511, 55 S.Ct. 497, where it had invalidated provisions of the New York Milk Control Act, which had set up a system of minimum prices to be paid by dealers to producers, including dealers shipping milk into New York from other states. The *Hood* Court noted that in neither case was the measure "supported by health or safety regulations but solely by protection of local economic interests such as supply for local consumption and limitation of competition." 336 U.S. at 531, 69 S.Ct. at 661–62. Ensuring a commodity's availability and guarding against whatever evils result from out-of-state competition are not acceptable policy concerns upon which a state may justify the regulation of interstate commerce. *Id.*

The Supreme Court has not altered its views as to the unconstitutionality of state strictures on economic competition from outside the state in the decades since *Baldwin* and *Hood* were decided. Rather, since those cases were handed down, the Court has continually reiterated its position. In *Lewis,* 447 U.S. at 43–44, 100 S.Ct. at 2019, for instance, the Court stated unequivocably:

> In almost any Commerce Clause case it would be possible for a State to argue that it has an interest in bolstering local ownership, or wealth, or control of business enterprise. Yet these arguments are at odds with the general principle that the Commerce Clause prohibits a State from using its regulatory power to protect its own citizens from outside competition.

■ Cases such as *Baldwin, Hood, Lewis,* and *Safeway* lend strong support to the Court's conclusion that Gerace's denial of Farmland's applications was based on a purpose to discriminate against interstate commerce. These cases make clear that even if the Court accepts Gerace's contention that excluding Farmland from the market is necessary to keep existing producers in business and ensure a plentiful supply of milk for New York consumers, denying the out-of-state dealer access into the market on that basis is in direct conflict with the principles of the commerce clause.

Although the reasons Gerace espoused in his December 11, 1986 decision for his refusal to grant Farmland's license are, by themselves, sufficient grounds upon which this Court can conclude that Gerace acted in violation of the commerce clause, a discussion of the background leading up to the denial may help bring the nature of the former Commissioner's discriminatory action into clearer focus. On December 30,

---

5. At the time *Hood* was decided, § 258–c read in pertinent part as follows:

"No license shall be granted to a person not now engaged in business as a milk dealer except for the continuation of a now existing business, and no license shall be granted to authorize the extension of an existing business by the operation of an additional plant or other new or additional facility, unless the Commissioner is satisfied ... that the issuance of the license will not tend to a destructive competition in a market already adequately served, and that the issuance of the license is in the public interest."

N.Y.Agric. & Mkts.Law, Consol.Laws, c. 126 (1934).

1985, Farmland applied to the Department of Agriculture and Markets ("Department") for an extension of its milk dealers license to include New York, Bronx, Kings, and Queens Counties. Three months later, on or about April 3, 1986, the Department informed Farmland that it would need to hold a hearing on Farmland's applications. On April 10, 1986, Tuscan Dairy Farms, Inc. ("Tuscan"), a New Jersey based corporation, submitted an application to extend its license in connection with its acquisition of certain assets of Dairylea Cooperative, Inc. ("Dairylea"), a major New York dairy company. The following week, the Department sent notices to licensed milk dealers informing them of Tuscan's acquisition and soliciting written comments regarding Tuscan's licensing application. The Department granted Tuscan's application on May 2, 1986, effective May 5, 1986. A letter dated May 6, 1986, sent to Tuscan by the Department, indicates that the license was granted on the understanding that Tuscan seek departmental approval for any significant change in plant source of packaged milk for at least one year following the effective date of the license extension. This condition ensures that the customers served by Dairylea prior to Tuscan's acquisition will continue to receive milk processed at Dairylea's Queens County plant and that the volume of New York produced milk will be uneffected by New Jersey competition.

Farmland moved this Court on June 10, 1986 for a preliminary injunction enjoining Gerace from applying § 258–c to Farmland's license applications in an unconstitutional manner. The Department commenced hearings on Farmland's applications on June 23, 1986. The hearings were pronounced closed on July 18, 1986, after four weeks and two thousand, two hundred and sixty-three pages of testimony, presented by thirty-six witnesses, and the introduction of sixty-one exhibits. In an Order dated July 29, 1986, this Court denied Farmland's motion for a preliminary injunction with the right to renew on October 13, 1986, roughly three months after the close of the hearings, by which time Gerace was

to render a determination. On August 7, 1986, Gerace moved this Court for an order granting him summary judgment on the grounds that Farmland's claim for damages is barred by the eleventh amendment to the United States Constitution or, alternatively, by the doctrine of official immunity, and that its request for injunctive relief is moot. Farmland cross-moved for partial summary judgment, on August 22, 1986, seeking a declaration that Gerace's application of § 258–c is a *per se* violation of the commerce clause.

On September 10, 1986, the hearing officer that presided over the Farmland hearings issued his report and recommendation to Gerace. The report contained a detailed, comprehensive summary and analysis of the testimony given. The hearing officer concluded that Farmland's entry into the market would not tend to a destructive competition but would in fact be in the public interest, and recommended to Gerace that Farmland's application be granted. Hearing Officer's Report, State of New York Department of Agriculture and Markets 38–39 (Sept. 10, 1986).

Farmland renewed its motion for a preliminary injunction on October 14, 1986. On October 24, 1986, the last business day before the Court heard oral argument on the motions now pending, Gerace issued a decision to reopen the hearings, concluding that the two thousand, two hundred and sixty-three page, thirty-six witness record was insufficient to make a final determination. Commissioner's Determination to Reopen Hearings, State of New York Department of Agriculture and Markets (Oct. 24, 1986).

Following oral argument, Gerace informed the Court that the reopened hearings would be scheduled for November 20 and 21, 1986 and indicated that a final determination would be reached by December 11, 1986. The Court agreed to refrain from deciding the motions until that time. At a conference on November 25, 1986, Gerace informed the Court that the reopened hearings had not yet been closed and requested additional time to decide

Farmland's applications. The Court denied the request. On December 11, 1986, Gerace rendered his determination, denying Farmland's license application.

The history of this case appears to the Court to offer further evidence of the unconstitutional, protectionist purposes, stated or unstated, that are at the root of Gerace's denial of Farmland's license extension. The record indicates that Farmland is able to process and sell milk more cheaply than the present New York dairy companies. Hearing Officer's Report, State of New York Department of Agriculture and Markets 38 (Sept. 10, 1986). The hearing officer who presided over Farmland's hearings cited the significant reduction in the price of milk in Richmond County since Farmland's entry into that market as a basis on which he predicted a drop in the price of milk in New York, Bronx, Kings, and Queens Counties if Farmland's license extension were granted. The hearing officer concluded that if Farmland were permitted to participate in the milk market in those four counties, milk prices there would be comparable to the now lower Richmond County price. The hearing officer did indicate that less efficient companies, unable to compete, might be driven out of the market. This, he concluded, would leave the market open to competition among the most efficient dealers, keep the price of milk down, and be in the public's best interest. *Id.* at 38–39. The fact that Gerace, without offering any explanation, followed a course of conduct completely contrary to that recommended by the hearing officer, who presided at the hearings and prepared a comprehensive, well reasoned analysis of the evidence presented, seems to demonstrate a desire on the part of Gerace to protect the New York dairy companies.

Gerace's apparent efforts to insulate the New York dairies from outside competition can also be seen in his decision to reopen the hearings. Section 258–c provides that

unless the Commissioner finds, *by a preponderance of the evidence,* that destructive competition would result, the license shall not be denied. Gerace, in making his determination to reopen the hearings stated, "The evidence in the record concerning customer solicitation and service in this market ... is not sufficient to reach a conclusion as to whether entry of the applicant would tend to a destructive competition in a market already adequately served." Commissioner's Determination to Reopen Hearings, State of New York Department of Agriculture and Markets (Oct. 24, 1986). Since, according to Gerace's own statement, the advent of destructive competition was not proven by a preponderance of the evidence, the statute calls for the issuance of the license. Instead of granting the license on the ground that a tendency toward destructive competition was not proven by a preponderance of the evidence, Gerace found that the lengthy transcript was insufficient in three areas: (1) the extent of excess plant and delivery capacity of the present New York milk dealers; (2) the impact of additional competition on services provided throughout the market; and (3) present and proposed methods of customer solicitation. These areas of inquiry accounted for a significant portion of the testimony in the thirteen volume transcript and were discussed in detail in the report and recommendation prepared by the hearing officer.[6]

The Court's consideration of the hearing officer's recommendation and the transcript on which it is based is not undertaken in order to conclude that Gerace's determination was erroneous under state law. Such a finding, of course, cannot appropriately be made by a federal district court, but only by a state court. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The facts surrounding Gerace's denial of Farmland's license, how-

**6.** A review by this Court of the two thousand, two hundred and sixty-three page transcript indicates that approximately eighty-five pages of testimony were devoted to the extent of excess plant and delivery capacity, the impact of com-

petition on services in the market was covered in approximately one hundred and twenty-five pages, and approximately two hundred pages were dedicated to the area of customer solicitation.

ever, are pertinent to the Court's analysis of whether it was motivated by a discriminatory purpose and thus in violation of the commerce clause of the United States Constitution.

Additional evidence of the former Commissioner's discriminatory purpose can be found in his efforts to delay making a final determination on Farmland's application. Farmland applied for its license extension on December 30, 1985. Three months thereafter Gerace decided it would be necessary to hold hearings on Farmland's application. The hearings originally were pronounced closed on July 18, 1986 and the hearing officer's report was completed on August 7, 1986. Gerace did not determine that more hearings would be necessary until October 24, 1986, the last business day before oral argument was heard on the motions now under consideration. The second set of hearings was not scheduled until almost a month later and it is only by instruction of this Court that Gerace reached a final determination on December 11, 1986.

The significance of this delay is heightened when it is compared to the expedited treatment given to Tuscan's application: No hearings were held regarding Tuscan and its license was granted in only twenty-six days. The difference in treatment is even more telling when viewed in light of the condition, noted earlier, upon which Tuscan's license was granted. The May 6th letter sent from the Department to Tuscan indicates that Tuscan's license was extended to include New York, Bronx, Kings, Queens, Richmond, Westchester, Nassau, and Suffolk Counties provided that Tuscan sell in those markets only New York processed milk, and not import milk from its New Jersey plant. Through this understanding, Gerace has managed to preserve for the New York milk processors their share of the New York milk market, insulating them from competition from New Jersey producers.

The circumstances surrounding the denial of Farmland's applications, when viewed cumulatively, indicate that Gerace's purpose was to protect the in-state milk dealers from competition from out-of-state dealers. Insulating in-state producers from out-of-state competition is at odds with the principles of, and thus violates the commerce clause.

The Court finds, therefore, that Gerace's purpose as stated, and the purpose that can be inferred from Gerace's actions, are discriminatory in nature and thus violative of the commerce clause.

### B. EFFECT

Even if it is assumed that Gerace did not have a discriminatory purpose in denying Farmland's applications, the denial still constitutes a virtual *per se* violation of the commerce clause if it is found to have a discriminatory effect. As the Supreme Court held in *City of Philadelphia*, 437 U.S. at 626–27, 98 S.Ct. at 2537, in the course of striking down as violative of the commerce clause a New Jersey law that prohibited the importation of waste that originated outside the state, "whatever [a state's] ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *See also Hunt*, 432 U.S. at 352–53, 97 S.Ct. at 2446 (North Carolina statute which prohibits the display of Washington State apple grades on closed apple containers shipped into the state discriminates against interstate commerce and thus cannot withstand constitutional challenge, regardless of whether consumer protection was the state's true purpose).

There can be little question that Gerace's denial of Farmland's license request does indeed result in a discriminatory effect on interstate commerce. The former Commissioner's denial of the license prohibits Farmland from sending its milk, processed in New Jersey, to New York for consumption. This scenario is precisely what the commerce clause was designed to guard against. Here we have a producer from State "A" who wants to participate in State "B"'s market. State "B", concerned about

the adverse effect this might have on the existing market participants, denies the State "A" producer access to the market. Such protectionism invites retaliation by State "A" whereby that state will close its doors to State "B" producers seeking to derive benefits from State "A"'s markets.

■ The commerce clause was enacted to prevent states from using their police power to neutralize any advantage an out-of-state producer may have over producers native to the state. If individual states regulate in order to shelter themselves from the economic reality that a sister state may be a more efficient producer, the solidarity and cohesiveness fostered by the Constitution will be severely undermined. The Constitution was "framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin*, 294 U.S. at 523, 55 S.Ct. at 500. Despite defendants' assertion that Gerace's action regarding Farmland has a minimal, if any, effect on interstate commerce, the former Commissioner's decision directly affects commerce by virture of the fact that a New Jersey company has been denied the right to send milk through interstate commerce in order to participate in New York's milk market. The discriminatory effect of such a decision is clear. The Court holds that, even putting to one side Gerace's unconstitutionally discriminatory purpose in denying Farmland's request for an extension of its New York license, the denial unconstitutionally discriminates against interstate commerce in its effect.

## II. DEFENDANTS' JURISDICTIONAL CLAIMS

■ Defendants rely on two jurisdictional grounds in their opposition to plaintiffs' motions and in support of their own motion for summary judgment, namely, standing and mootness. First, the defendants argue that Farmland does not have standing to contest the condition the Department imposed on Tuscan in issuing its license extension. Defendants contend that only

Tuscan has standing to challenge the constitutionality of its agreement with the Department that it seek departmental approval for any change in plant source of milk distributed in the counties to which its expanded license pertains. The weakness of this contention is that it misconstrues the relevance of Tuscan's agreement to this lawsuit. Farmland is not asking the Court to strike down Tuscan's conditional license as a violation of the commerce clause. This agreement is merely evidence of Gerace's discriminatory purpose which supports Farmland's claim that the former Commissioner's treatment of Farmland, not Tuscan, is unconstitutional. Clearly, Farmland has standing to challenge the constitutionality of Gerace's application of a state statute to its license request, and in doing so it may raise the Tuscan agreement as demonstrative of Gerace's intent to insulate New York dairy companies from New Jersey competition.

Second, defendants contend that even if Farmland has standing to bring this lawsuit, its commerce clause claim is moot and must therefore be dismissed. Defendants first raised this argument as a basis for their summary judgment motion after the original hearings had been pronounced closed. When Gerace reopened the Farmland hearings, the defendants withdrew that portion of their summary judgment motion. Defendants renewed that aspect of the motion after the hearings were once again pronounced closed and a determination was rendered. The essence of defendants' mootness claim is as follows: Farmland's claim is that its constitutional rights are being violated by the imposition of protracted hearings in connection with its license applications; upon completion of the hearings the challenged conduct no longer exists.

■ Much the same as their standing argument, defendants' mootness claim completely misses the point of this lawsuit. Farmland alleges that Gerace, in his effort to suppress out-of-state competition, violated Farmland's constitutional rights by impeding Farmland's entry into the New

York market. Although Farmland places heavy reliance on the delay in its application process to evince Gerace's protectionist motives and stresses, in particular, the disparity in the time involved in Farmland's as compared to Tuscan's application procedures, this appears merely to be designed to support Farmland's claim that Gerace engaged in economic protectionism. The relief sought by Farmland throughout this litigation has always been a constitutional application of § 258–c and not merely a final determination by the Commissioner one way or the other. That the hearings are closed and a final determination has been issued does not render Farmland's commerce claim moot.

### III. FARMLAND'S CLAIM FOR DAMAGES

Farmland seeks money damages against Gerace for his unconstitutional treatment of Farmland's license applications during his tenure as Commissioner. In their motion for summary judgment, defendants argue that the eleventh amendment to the United States Constitution bars Farmland's damages claim.

██ The eleventh amendment states, "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." U.S.CONST. amend. XI. The United States Supreme Court has expanded the scope of the literal language of the amendment so as to bar not only suits brought against a state by citizens of other states, but also suits brought by a state's own citizens. *E.g.,* *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, *reh'g denied,* 416 U.S. 1000, 94 S.Ct. 2414, 40 L.Ed.2d 777 (1974); *Employees v. Department of Public Health and Welfare,* 411 U.S. 279, 93

S.Ct. 1614, 36 L.Ed.2d 251 (1973); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The eleventh amendment, however, does not protect state officials who, as a result of unauthorized, *ultra vires* action, may be subject to damages assessed against them in their individual capacities to be paid, not out of the state treasury, but from their personal funds. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 908 n. 11, 79 L.Ed.2d 67 (1984); *Scheuer v. Rhodes,* 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Dwyer v. Regan,* 777 F.2d 825, 836 (2d Cir.1985), *modified on other grounds,* 793 F.2d 457 (2d Cir.1986); *Cullen v. New York State Civil Service Commission,* 435 F.Supp. 546, 558 (E.D.N.Y.1977), *appeal dismissed,* 566 F.2d 846 (2d Cir.1977). The question thus becomes whether Farmland's allegations regarding the nature of Gerace's actions are adequate to state a claim of potential liability for damages against the former Commissioner in his individual capacity and thereby avoid the eleventh amendment bar.

██ Defendants argue that, as Farmland's complaint does not allege that Gerace acted outside the scope of his authority, Farmland cannot avoid the eleventh amendment bar. The Court concludes, however, that Farmland's complaint does state sufficient allegations of Gerace's *ultra vires* conduct. The complaint explicitly alleges that Gerace's unconstitutional conduct was motivated by an animosity toward Farmland that stemmed from its state origin and prior litigation that Farmland had brought against the former Commissioner.[7] (Complaint ¶ 28). A court may grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* — U.S. —, —, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986);

---

**7.** Farmland has previously filed lawsuits against Gerace both in state and federal court challenging his conduct with regard to Farmland's applications for an extension of its license to distribute milk in Richmond County, *e.g., Farmland v.* *Gerace,* No. 85 Civ. 0729 (E.D.N.Y.) (Wexler, J.), and Nassau and Suffolk Counties, *e.g. Farmland v. Gerace,* No. 83 Civ. 4693 (E.D.N.Y.) (Wexler, J.).

*American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272, 278–79 (2d Cir.1967), *cert. denied,* 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972). Furthermore, on a motion for summary judgment, "inferences to be drawn from the underlying facts.... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Applying these well-established principles to the Court's consideration of the adequacy of Farmland's claims against Gerace, the Court finds that Farmland's allegation that Gerace used his position, purposefully and with ill motives, unconstitutionally to curtail the flow of interstate commerce presents a genuine issue of material fact as to whether he acted within the scope of his authority sufficient to defeat the defendants' motion for summary judgment.

■■■■■ In their motion for summary judgment, defendants also argue, in the alternative, that Farmland's damages claim is barred by the doctrine of official immunity, as Gerace is entitled to absolute immunity from claims such as the one Farmland has brought against him. Defendants' contention is simply incorrect. Executive officials, when sued for damages resulting from a violation of constitutional rights, are generally entitled only to qualified immunity. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Scheuer,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90. Qualified or good faith immunity provides state executives and their administrative aides adequate protection from liability, *Scheuer,* 416 U.S. at 247–48, 94 S.Ct. at 1691–92, without leaving remediless a plaintiff subjected to an intentional or bad faith deprivation of federally protected rights. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214, *reh'g denied,* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975).

Gerace asserts, however, that he is entitled to absolute immunity in so much as his decision to hold hearings in Farmland's case can be analogized to that of a prosecutor deciding to initiate a criminal prosecution. In support of his analogy, the Commissioner relies on *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). In *Butz,* the Department of Agriculture initiated administrative proceedings in which the Department sought to revoke or suspend a merchant's registration because of allegations of the merchant's wrongdoing. The Supreme Court held that the role of the Secretary of Agriculture in *Butz* was functionally comparable to that of a prosecutor in a criminal proceeding and entitled the Secretary to absolute immunity. 438 U.S. at 515, 98 S.Ct. at 2915.

■■■ The exception carved out in *Butz* does not, nonetheless, extend so far as to provide Gerace with an absolute shield from liability in the present case. First, as was noted above, Gerace's decision to hold hearings in connection with Farmland's license extension is merely one aspect of Farmland's challenge to his application of § 258-c. Thus, even if Gerace's decision to hold hearings is analogous to decisions made by a prosecutor, the overall delay that occurred, the lack of consideration given to the hearing officer's recommendation, the expedited treatment accorded Tuscan's application, the understanding entered into between the Department and Tuscan, and the former Commissioner's articulated basis for preventing an out-of-state producer access to the market all involve administrative decision making and do not fall within the realm of prosecutorial functioning.

In addition, *Butz* itself made clear that its holding is an exception to the general rule of only qualified immunity for administrative officials, 438 U.S. at 507, 98 S.Ct. at 2911, and it is incumbent upon Gerace to prove that the circumstances justify absolute immunity. *See Harlow,* 457 U.S. at 808, 102 S.Ct. at 2733. *See also Walden v. Wishengrad,* 745 F.2d 149, 151–53 (2d Cir. 1984) ("absolute immunity should be accorded only in exceptional cases"). Gerace

has not met this burden. In *Butz,* the Department of Agriculture issued an administrative complaint alleging that a commodity futures commission merchant violated financial requirements of the department. An attorney for the department prosecuted the case against the merchant in an administrative proceeding in order to prove the charges and impose as a sanction the revocation or suspension of the merchant's registration. Here, in contrast, there was no complaint filed and no accusations of wrongdoing on the part of Farmland were made. The hearings in this case were routine hearings, held in the ordinary course of the license application process. If any time hearings were held with regard to state licensing procedures the state officials were granted absolute immunity, the rule of qualified immunity would be eaten up by the exception.[8]

Defendants' motion for summary judgment on the grounds that Farmland's claim for damages is barred by the eleventh amendment or, alternatively, by the doctrine of official immunity is denied.

## IV. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment declaring Farmland's claim for injunctive relief moot, and Farmland's damages claim against Joseph Gerace, in his individual capacity, to be barred by the eleventh amendment or, alternatively, by the doctrine of official immunity, is denied. Plaintiffs' motion for summary judgment on the grounds that Gerace's application of § 258–c to Farmland's license request discriminates against interstate commerce and thus constitutes a violation of the commerce clause of the United States Constitution is granted. Gerace's December 11, 1986 decision denying Farmland's application seeking an extension of its milk license so as to allow it to distribute milk in New York, Bronx, Kings, and Queens Counties

is unenforceable as violative of the commerce clause both in its discriminatory purpose and discriminatory effect. The Commissioner of the New York State Department of Agriculture and Markets is permanently enjoined from applying § 258–c unconstitutionally by continuing to deny Farmland access to the New York milk market.

SO ORDERED.

---

8. The Commissioner does not raise qualified immunity as a basis for his summary judgment motion. In any event, the issue of good faith is at the root of the qualified immunity doctrine, and therefore cannot appropriately be resolved on a motion for summary judgment. *Harlow,* 457 U.S. at 815–17, 102 S.Ct. at 2736–38.