STATE OF NEW YORK by Robert ABRAMS, Attorney General,
Plaintiff,

v.

Arthur R. BROWN, Jr., et al.,
Defendants.

Civ. A. 88–1512.

United States District Court,
D. New Jersey.

May 24, 1989.
As Amended Sept. 20 and Oct. 11, 1989.

Robert Abrams, Atty. Gen. State of New York, Lloyd Constantine, Asst. Atty. Gen., Chief, Antitrust Bureau, Joseph Opper, Karen Mankes, Pamela Jones, New York City, and Linda Gargiulo, Nutley, N.J., for plaintiff.

W. Cary Edwards, Atty. Gen. of New Jersey (at time of briefing and argument), Eugene J. Sullivan, Asst. Atty. Gen., Mark

Oshinskie, Deputy Atty. Gen., Trenton, N.J., for defendants.

## OPINION

WOLIN, District Judge.

The State of New York, by its Attorney General, has brought this action to challenge a New Jersey statute and regulation that prohibit the sale of milk in New Jersey below cost. New York alleges that the statute and regulation have both the purpose and effect of discriminating against New York milk dealers and thus violate the Commerce Clause of the United States Constitution both on their face and as applied. New York has named as defendants Arthur R. Brown, Jr., the New Jersey Secretary of Agriculture, and Woodson W. Moffett, Jr., the Director of the State's Division of Dairy Industry.

Brown and Moffett have moved for summary judgment on three grounds. First, defendants contend that this Court has no jurisdiction to hear this case. Second, Brown and Moffett argue that New York has no standing to assert the interests of New York milk dealers, who, Brown and Moffett contend, are the aggrieved parties, if any. Finally, the New Jersey defendants argue that the statute and regulation in question do not violate the Commerce Clause but rather are the least burdensome method of achieving the valid legislative goal of promoting stability in an industry that is particularly susceptible to destructive competition. New York has cross-moved for summary judgment. The Court will deny both motions.

## BACKGROUND

Ever since the time of the Great Depression, which witnessed the destructive effects of unchecked competition on the dairy industry, the federal government[1] and many individual States have regulated the price of milk. According to defendants, 20 States currently set minimum prices at or above which dealers must sell to retailers. Milk's perishability and the industry's sensitivity to anticompetitive practices create the need for this regulation; price competition can quickly destroy many dealers, leading to monopolies or oligopolies and ultimately higher consumer prices. As they affect the purely internal commerce of a State, state milk control laws are evaluated under the Due Process Clause of the Fourteenth Amendment and will be upheld as long as the laws are rationally related to the Legislature's purposes. *Nebbia v. New York*, 291 U.S. 502, 538–39, 54 S.Ct. 505, 516–17, 78 L.Ed. 940 (1934). As they impinge on interstate commerce, however, state milk control laws are subject to the more exacting scrutiny of the Commerce Clause. *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 519, 521–26, 55 S.Ct. 497, 498, 499–501, 79 L.Ed. 1032 (1935).

In order to reduce the instability in the State's milk industry, the New Jersey legislature in 1941 enacted the New Jersey Milk Control Act ("the Act"), ch. 274, 1941 N.J. Laws 713 (codified as amended at N.J.S.A. § 4:12A–1 *et seq.*).[2] *See Garden State*

---

**1.** *See* 7 U.S.C. § 601 *et seq.;* 7 C.F.R. part 100 *et seq.*

**2.** The Legislature made the following findings in a preamble to the Act:

It is found and declared that an emergency exists affecting the milk industry in this State; in the interest of the health and welfare of the citizens of this State, it is necessary to continue control of the milk industry in this State; that this act is an emergency law, necessary for the immediate preservation of the public peace, to preserve, protect and promote the public welfare, health and safety, and enacted in the exercise of the police power reserved to the States to protect the citizens of this State in such respect; that it is made necessary by the conditions of unfair, unjust, destructive and demoralizing practices, heretofore existing or threatened, and presently threatening, in the production, sale and distribution of milk which are likely to result in the demoralization of the agricultural interests of this State engaged in the production of milk and the creation of conditions inimical to the health of the public of this State; that it is the policy and intent of this act to prevent these unfair, unjust, destructive and demoralizing practices by providing a reasonable return for the milk producer, so as to prevent possible curtailment of a sufficient supply of fresh, wholesome, sanitary milk for our citizens; and that it is necessary in order to assure an adequate supply of fresh, wholesome, sanitary milk and to protect the public health and welfare, to treat the production, sale and dis-

*Farms, Inc. v. Mathis,* 61 N.J. 406, 422–23, 294 A.2d 713, 721 (1972); *Abbotts Dairies, Inc. v. Armstrong,* 14 N.J. 319, 323–24, 328, 102 A.2d 372, 374–75, 376–77 (1954). The Act establishes a Milk Control Board and vests certain powers in the Director of Milk Control. N.J.S.A. §§ 4:12A–2 & –3. The Act provides that, subject to certain limitations not relevant here,

> [t]he director may fix the price at which milk is to be bought, sold, or distributed; regulate conditions and terms of sale; establish and require observance of fair trade practices; supervise, regulate and control the entire milk industry of the State of New Jersey, including the production, importation, classification, processing, transportation, disposal, sale or resale, storage or distribution of milk as defined in this act in the State of New Jersey in those matters and in every way necessary to carry out the purposes of this act and necessary to control or prevent unfair, unjust, destructive or demoralizing practices which are likely to result in the demoralization of agricultural interest in this State engaged in the production of milk or interfere with the maintenance of a fresh, wholesome supply of sanitary milk for the consumers of this State.

*Id.* § 4:12A–21. The Director originally imposed absolute minimum prices applicable to all sellers of milk in New Jersey. In 1980, however, the Director abolished these fixed minimum prices and instead promulgated regulations prohibiting milk producers from selling milk below their cost. The regulations provide:

> It shall be unlawful and a violation of these regulations for any dealer licensee to directly or indirectly be a party to, or assist in, any transaction to sell or offer to sell milk and milk products within the State of New Jersey, or for sale in the State of New Jersey at less than the cost thereof as hereinafter defined; but nothing in this regulation shall prevent a dealer from meeting the price or offer of a competitor for a product or products of like quality and nature in similar quantities; but nothing in this section shall prohibit bulk, distress or business-closing sale if prior notice of such sale has been filed with the Director of the Division of Dairy Industry; provided however that the burden of proving and properly documenting the meeting of a competitive price shall rest with the licensee asserting the claim.

N.J.Admin.Code § 2:52–6.1. The definition of cost adopted by the Director is what is commonly known as "average total cost" or "fully distributed cost." [3] Under this standard the cost of a unit of output is calculated by totalling all the expenses of production—including fixed costs such as rent, executive compensation and insurance—and dividing by total output. In contrast to the average total cost or fully distributed cost, "marginal cost" is the seller's cost to produce the next additional output of milk. This cost is difficult to calculate, so "average variable cost" is frequently used in its stead. Average variable cost, which by definition is lower than average total cost, includes variable costs such as raw materials, fuel and labor, but excludes all fixed costs. *See O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 349 (3d

tribution of milk as a business affecting the public health and affected with a public interest.

Ch. 274, 1941 N.J.Laws 713, *quoted in* Historical Note following N.J.S.A. § 4:12A–1.

**3.** The term "cost" is defined as follows:

The term 'cost' as used herein shall include, but not be limited to, the basic cost of raw or reconstituted milk or derivatives thereof as determined in accordance with the joint State–Federal orders administered by the Division of Dairy Industry and the United States Department of Agriculture in the State of New Jersey; the cost of any added ingredients;

and all other costs associated with the business of the dealer, for example, but not limited to, the cost of material, labor, salaries of executives and officers, the cost of receiving, cooling, processing, manufacturing, storing and distributing the product sold; rent, depreciation, selling expense, maintenance charges, delivery expense, license fees, taxes, insurance, advertising, advertising allowances, gifts, free service and all other costs as may be incurred, allocated proportionately to each unit of product sold in accordance with generally accepted cost accounting principles.

N.J.Admin.Code § 2:52–6.2.

Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982); Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 716–17 (1975).

Additional regulations promulgated by the Director prohibit a milk retailer from changing its source of milk without the prior approval of the Director. Such approval may only be obtained upon two weeks' notice to the Director and the current milk dealer and upon a determination by the Director that no regulations, including the below-cost regulation, would be violated. N.J.Admin.Code § 2:53–4.1.

New York alleges that on 177 occasions in the period between January 1, 1985 and November 23, 1987, New Jersey retailers filed with defendants notices of intent to switch to milk suppliers who are licensed, incorporated and domiciled in New York and who ship their milk from facilities within New York, and that in at least 35 such instances defendant Moffett denied the applications as violative of the New Jersey below-cost regulation. Among the New York dealers alleged to be the subject of such rejection notices are Dellwood Foods, Inc., Queens Farms Dairy, Inc., Beyer Farms, Inc., Queensboro Farm Products, Inc. and Pound Ridge Dairy, Inc.[4] New York alleges that in many of these instances the New York dealer had evinced the intention to sell milk competitively and profitably above average variable cost, but that in all such instances Moffett's action effectively prohibited the shipment of wholesome and competitively priced milk from New York to New Jersey. According to New York, defendants have enforced the regulations so as to prohibit a New Jersey retailer from buying milk in New York at a price below the New York dealer's average total cost. Plaintiff's Statement Pursuant to Local Rule 12(G), ¶ 8. In several of the above instances the sale from the dealer to the retailer was to have occurred in New York, so that Moffett's action prohibited sale transactions occurring wholly within the State of New York. First Amended Complaint ¶¶ 18–23. While conceding that New Jersey officials may prohibit the sale of milk below average variable cost, New York contends that it is a violation of the Commerce Clause for the New Jersey Director of Milk Control to prohibit pricing between average variable cost and average total cost.

Defendants have not filed a formal answer but instead have brought this summary judgment motion on three grounds. First, defendants contest this Court's jurisdiction by asserting that this case is a controversy between two States and thus within the exclusive jurisdiction of the Supreme Court pursuant to 28 U.S.C. § 1251(a). Brown and Moffett also contend that New York has no standing to bring this action and that the alleged wrongs can be addressed in another case filed in this Court by a New York dealer that does have standing, *Beyer Farms, Inc. v. Brown*, 721 F.Supp. 644. With regard to the merits, defendants argue that total average cost was selected as the regulatory cost standard because it most accurately reflects a dealer's true costs. Since a dealer who sells below this level cannot sustain a milk distribution business over an extended period of time, defendants argue, a dealer who sells below this level must be presumed to be doing so in order to purposefully drive competitors out of business. Of course, a dealer could compensate for the sale of a certain percentage of product at marginal cost by selling its remaining product at a price above total average cost. The result in the instant case, however, according to defendants, would be higher prices for New York consumers, the very people on whose behalf New York is allegedly suing. *See* Defendants' Initial Brief at 8–10.

---

**4.** New York alleges that in 1987 alone at least 30 applications by New York dealers to ship milk to New Jersey dealers were denied by Brown and Moffett because, although the dealers were selling above average variable cost, they were selling below average total cost. Dellwood Farms, Inc. was denied permission to supply 27 New Jersey retailers; Beyer Farms, Inc. was denied permission to supply three New Jersey retailers. Plaintiff's Statement Pursuant to Local Rule 12(G), ¶ 10.

Defendants further argue that the below-cost regulation is applied evenhandedly to all in-state and out-of-state dealers who sell or wish to sell in New Jersey. Sources cited by defendants indicate that of the 322 licensed milk dealers in the State, 82 or 26% are out-of-state dealers, and that 22% of the total milk sold in New Jersey is sold by out-of-state dealers. In addition, taking issue with New York's allegations, defendants argue that only two dealers—Dellwood and Beyer Farms—have received denials. Finally, defendants assert that New York's motive in bringing this action is merely to avenge a 1987 ruling requiring New York to open its milk market to out-of-state (particularly, New Jersey) dealers, *Farmland Dairies v. Commissioner of New York State Department of Agriculture and Markets*, 650 F.Supp. 939, 951 (E.D.N.Y.1987)[5]; this decision has allegedly resulted in reduced profits for New York milk dealers.

## DISCUSSION

### I. *Jurisdiction*

■ Defendants challenge this Court's jurisdiction to hear the case. Both defendants are officials of the State of New Jersey and have been sued in both their individual and official capacities. They assert that the real defendant is the State of New Jersey, and that a district court has no jurisdiction to hear a claim by one State against another.

Article III, § 2, cl. 2 of the United States Constitution provides that "[i]n all cases ... in which a State shall be a party, the Supreme Court shall have original Jurisdiction." Although that constitutional provision does not automatically render the Supreme Court's jurisdiction exclusive, *see Ames v. Kansas*, 111 U.S. 449, 464, 4 S.Ct. 437, 444, 28 L.Ed. 482 (1884); *United States v. 4,450.72 Acres of Land*, 27 F.Supp. 167, 176 (D.Minn.1939), *aff'd sub nom. Minnesota v. United States*, 125

F.2d 636 (8th Cir.1942), Congress has rendered the Supreme Court's jurisdiction of disputes between States exclusive by enacting 28 U.S.C. § 1251(a), which provides that "[t]he Supreme Court shall have original and exclusive jurisdiction of all controversies between two or more States."

New York seeks to avoid the effect of § 1251(a) on the ground that its naming of New Jersey officials is not merely a procedural ploy but rather a recognition of the fact that it is the officials' enforcement of the statute that is allegedly unconstitutional. According to New York, the New Jersey Legislature, in enacting the Milk Control Act, did not specifically empower and embrace the below cost pricing regulations promulgated by defendants and found in N.J.A.C. §§ 2:52–6.1 *et seq.*

In support of its argument, New York cites *Louisiana v. Texas*, 176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900). In that case Texas enacted a statute that gave both the Governor and the chief Texas Health Officer authority to promulgate regulations for the establishment and maintenance of quarantines against infectious diseases. In response to an outbreak of yellow fever, the Governor of Texas imposed a quarantine in border and coastal sections of Texas on persons and things coming from places infected by yellow fever. The quarantine regulations required fumigation and detention of ships and cargoes from infected ports, but permitted continued commerce between infected ports and Texas subject to those restrictions. Upon receiving a report that a case of yellow fever existed in New Orleans, the Health Officer placed an embargo on *all* commerce between New Orleans and Texas. Louisiana brought suit against Texas in the Supreme Court under the Court's original jurisdiction over disputes between States. *Id.* at 2–4, 20 S.Ct. at 252. Texas objected to the Supreme Court's original jurisdiction on the ground

---

**5.** Defendants also cite a New York below-cost regulation almost identical to New Jersey's. *See* New York Agriculture & Markets Law § 258–u. That regulation, however, has never been enforced, according to New York, and in any event has been repealed as of April 1, 1989 by

the New York Milk Control and Milk Producer Security Reform Act of 1987. Moreover, as New York notes, its regulation, in contrast to New Jersey's, prohibited below-cost sales only upon a finding that the purpose or effect of the transactions was to destroy competition.

that Louisiana was not contesting the acts of Texas as a State but rather the acts of the Texas Health Officer in carrying out a concededly constitutional statute in an unconstitutional manner. *Id.* at 12, 20 S.Ct. at 254. The Supreme Court agreed, holding:

> [I]n order that a controversy between States, justiciable in this court, can be held to exist, something more must be put forward than that the citizens of one State are injured by the maladministration of the laws of another.... [A] controversy between States does not arise unless the action complained of is state action, and acts of state officers in abuse or excess of their powers cannot be laid hold of as in themselves committing one State to a distinct collision with a sister State.

*Id.* at 22, 20 S.Ct. at 258. The Court went on to hold that Louisiana had not alleged facts to show that Texas had "so authorized or confirmed the alleged action of her health officer as to make it her own." Absent such allegations, the Court held, the two States were not in controversy within the meaning of the Constitution; therefore the Supreme Court did not have original jurisdiction over the dispute. *Id.* at 22–23, 20 S.Ct. at 258–59.

The unstated corollary of the *Louisiana v. Texas* holding is that if two States are not in controversy, 28 U.S.C. § 1251(a) does not preclude a district court from exercising jurisdiction over a dispute.

The Court agrees with New York that the case at bar does not involve a controversy between the States of New York and New Jersey. Ever since *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court has drawn a clear line between the sovereign acts of a State itself and the acts of its officials. Thus the Eleventh Amendment[6] does not bar suits by individuals against officials of a State for unconstitutional enforcement of valid State laws or even for enforcement of unconstitutional State laws because "the use of the name of the State to enforce an unconstitutional act ... is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity." *Id.* at 159–60, 28 S.Ct. at 454; *see Scheuer v. Rhodes,* 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974). Defendants note that the Supreme Court has never applied the doctrine of *Ex parte Young* to controversies between one State and the officials of another. There is no sound reason, however, not to so extend the doctrine. Just as a suit between a private citizen and the officials of a State is not barred by the Eleventh Amendment, so a suit between one State and the officials of another for the enforcement of an unconstitutional act or for the unconstitutional enforcement of a valid act is not barred by 28 U.S.C. § 1251(a). New York's First Amended Complaint attacks both the constitutionality of the Milk Control Act and the manner in which defendants are enforcing that Act through the regulations promulgated thereunder. This Court has jurisdiction to hear both aspects of New York's claim since 28 U.S.C. § 1251(a) is not applicable to this case.

## II. *Standing*

■ Defendants contend that New York has no standing to contest the New Jersey Milk Control Act and the ensuing regulations. New York counters that it has an interest of its own in protecting the rights of its citizens under the doctrine of *parens patriae* standing.

The Supreme Court recently revisited the common law doctrine of *parens patriae* standing in *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). After tracing the history of the common law doctrine, the Court noted that that doctrine has little to do with the concept of *parens patriae* standing that has developed in American law. In order to have standing

---

**6.** The Eleventh Amendment to the Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

under the modern doctrine, the Court noted, a state must have a "quasi-sovereign" interest. The Court defined such interests against the background of other interests asserted by States: sovereign interests, proprietary interests and private interests. *Id.* at 600–06, 102 S.Ct. at 3265–68. Quasi-sovereign interests, the Court held,

> fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.

*Id.* at 607, 102 S.Ct. at 3269. With respect to the first category, the Supreme Court declined to set any definite limit on the proportion of the State's population that must be adversely affected, but noted:

> Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population. One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.

*Id.*[7] With regard to the second category of quasi-sovereign interests, the Court noted that a State

> has an interest in securing observance of the terms under which it participates in the federal system. In the context of *parens patriae* actions, this means ensuring that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system. Thus, the State need not

wait for the Federal Government to vindicate the State's interest in the removal of barriers to the participation by its residents in the free flow of interstate commerce.

*Id.* at 607–08, 102 S.Ct. at 3269 (citing *Pennsylvania v. West Virginia,* 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923)).

In the case at bar, New York asserts quasi-sovereign interests in both categories. First, New York notes the importance of the dairy industry to the State's economy. The dairy industry generates over $3.5 billion annually and employs more than 60,000 people in the production, processing and distribution of dairy products. Plaintiff's Memorandum at 29 (citing Legislative Commission on Dairy Industry Development, Concerns of the Dairy Industry, at III (1986)). New York further notes that milk is an indispensable food to many New Yorkers and that its supply at reasonable prices must be assured. *Id.* Indeed, in a declaration of policy the New York legislature recognized the importance of the industry by stating that

> the milk industry is a paramount agricultural activity of this state and of the northeast ... and is a business affecting the public health and welfare of the inhabitants of this state and of the northeast; [and] that the production and marketing of milk ... is of vast economic importance to the state and ... of great importance both to the welfare of the [state's] dairy farmers and health and welfare of the consumers....

New York Agriculture and Markets Law § 258–p. As further evidence of the importance of its dairy industry, New York points out that its legislature granted the State Attorney General the power to bring lawsuits such as the instant one to challenge laws perceived to violate the Commerce Clause.[8]

---

**7.** Of course, private bills that have been or could be enacted to aid particular individuals do not evince a general interest that would give the State standing. 458 U.S. at 607 n. 14, 102 S.Ct. at 3269 n. 14.

**8.** The Milk Control and Milk Producer Security Reform Act of 1987 provides:

> Upon referral of any complaint by the commissioner [of the department of agriculture and markets], the attorney general may bring an action in any state or federal court within or outside the state, for the purpose of invalidating such barriers or burdens upon interstate commerce and for such other relief as

As already noted, New York asserts an alternative quasi-sovereign interest, namely, its interest in not being discriminatorily denied its rightful status within the federal system. Suits under the Commerce Clause, New York argues, are particularly apt for *parens patriae* standing since, as stated in *Snapp*, a State has an interest in securing for itself and its citizens the benefits of federalism. *See* 458 U.S. at 608, 102 S.Ct. at 3269; *see also Great Atlantic and Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 380, 96 S.Ct. 923, 932, 47 L.Ed.2d 55 (1976).

Finally, New York contends that the fact that it is seeking injunctive, and not monetary, relief militates in favor of *parens patriae* standing. *See Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 261, 92 S.Ct. 885, 890–91, 31 L.Ed.2d 184 (1972).

Defendants deny that New York has a quasi-sovereign interest in either category. Addressing the first category, defendants contend that New York has not alleged injury to a sufficiently substantial segment of its population. Rather, defendants contend, it is the interests of a small number of New York milk dealers that are at stake. Moreover, defendants argue, the interests of this "special interest group" are at odds with the interests of New York milk consumers because the sale by New York dealers below cost in New Jersey would arguably result in higher milk prices for New York consumers. This conflict, according to defendants, belies New York's stated motive of acting on behalf of its citizenry. Defendants have not responded directly to New York's alternative argument that it has *parens patriae* standing to challenge the alleged denial of its rightful status within the federal system.

The Court finds that New York has asserted quasi-sovereign interests in both *Snapp* categories and therefore has *parens patriae* standing to challenge the New Jersey milk pricing regulation. Under *Snapp* New York clearly has a quasi-sovereign interest in the economic well-being of

its citizens. 458 U.S. at 607, 102 S.Ct. at 3269. As already noted, the dairy industry is one of the State's most significant, generates over $3.5 billion annually and employs more than 60,000 people. Although there is no magic formula for determining whether the alleged injury is of a sufficient magnitude, the Court believes that limitations on the right of one of a State's most significant industries to export its products to a neighboring State cause sufficient injury to the State's economic well-being as to give the State *parens patriae* standing. The alleged wrong, if proven by New York,

> limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States. These are matters of grave public concern in which [New York] has an interest apart from that of particular individuals who may be affected. [New York's] interest is not remote; it is immediate.

*Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 451, 65 S.Ct. 716, 723, 89 L.Ed. 1051 (1945) (granting Georgia *parens patriae* standing to challenge an alleged price-fixing conspiracy in the railroad industry). Moreover, as indicated in *Snapp*, a State is likely to have *parens patriae* standing with respect to injuries that the State would likely address through its sovereign lawmaking powers. 458 U.S. at 607, 102 S.Ct. at 3269. Here New York has done just that in enacting legislation that authorizes the State's Attorney General to bring suit in courts of any State to challenge statutes and regulations that restrict the access of New York milk dealers and producers to out-of-state markets. The Court rejects defendants' argument that this statute, even if it were deemed special interest legislation, is a "private bill" within the meaning of *Snapp* and thus unworthy of consideration by the Court. *See* 458 U.S. at 607 n. 14, 102 S.Ct. at 3269 n. 14. Rather, the statute supports this Court's conclusion that New York has *parens patriae* standing in the case at bar.

may be appropriate. The attorney general may bring such action in a *parens patriae* capacity.

New York Agriculture and Markets Law § 258–r(4).

Nor does the Court attach much importance to defendants' arguments that New York is acting on behalf of its dairy industry to the detriment of New York consumers. Such an argument, though tantalizing, is unacceptable because it prejudges the merits at the threshold inquiry of standing. Furthermore, although the sale by New York dealers in New Jersey of milk products below cost may initially result in higher milk prices for New York consumers, New York could very well have concluded that such sales would strengthen the New York milk industry, thus benefiting the New York economy as a whole, and perhaps ultimately resulting in lower milk prices for New York consumers. More importantly, it is for New York to decide whether in protecting the rights of one substantial class of its citizens it is willing to tolerate jeopardizing the rights of another.

## III. *The Merits*

The Commerce Clause of the United States Constitution, art. I, § 8, cl. 3, grants Congress the power "[t]o regulate Commerce ... among the several States...." This grant of power to Congress has an obverse—commonly known as the "dormant" Commerce Clause (but hereinafter referred to merely as the Commerce Clause)—which prohibits the States from "erecting barriers to the free flow of interstate commerce." *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978). Although the Commerce Clause itself does not expressly fix the bounds of these restraints, the Supreme Court has extrapolated those boundaries from the purposes of the Commerce Clause; those purposes were expressed by Justice Jackson in his oft-quoted opinion in *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949):

> This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of [sic] the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separate economic units....
>
> The material success that has come to inhabitants of the states which make up this federal free trade unit has been the most impressive in the history of commerce, but the established interdependence of the states only emphasizes the necessity of protecting interstate movement of goods against local burdens and repressions....
>
> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

*Id.* at 537–39, 69 S.Ct. at 665; *see City of Philadelphia v. New Jersey*, 437 U.S. 617, 623, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).

In order to distinguish legitimate state regulation from state laws repugnant to the Commerce Clause, the Supreme Court has adopted a two-tiered analysis. Where a state statute directly regulates or discriminates against interstate commerce, or where it has the effect of favoring in-state economic interests over out-of-state interests, the Court has generally struck down the statute as per se unconstitutional without engaging in further analysis. *Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 578–79, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986) (citing *City of Philadelphia, supra,* and other cases). On the other hand, where the statute has only indirect effects on interstate commerce and regulates evenhandedly, the Court has upheld the statute so long as the incidental effects on interstate commerce do not clearly outweigh the putative local benefits. *Id.; Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct.

844, 847, 25 L.Ed.2d 174 (1970) (citing *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852 (1960)). The Court has recognized that there is no bright line between the two tiers of the analysis and that under either approach the key consideration is the "overall effect of the statute on both local and interstate activity." *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084–85 (citing *Raymond Motor*, 434 U.S. at 440–41, 98 S.Ct. at 793–94).

Of the many occasions on which the Supreme Court has had the opportunity to review milk control regulations under the Commerce Clause, *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), is the most closely on point.[9] At issue in *Baldwin* was a New York regulation that prohibited the sale in New York of milk supplied by out-of-state dealers unless the dealer had paid the out-of-state producer a minimum price fixed by the regulation. New York had conceded that it could not regulate the price of milk sold in Vermont nor prohibit the introduction into New York of milk acquired in Vermont, no matter what the price. The Supreme Court, in an opinion by Justice Cardozo, struck the law down on the ground that the establishment of minimum prices would "set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported." *Id.* at 521, 55 S.Ct. at 500. The Court rejected an argument that the statute was a valid exercise of New York's police power designed to ensure an adequate and stable supply of milk by allowing farmers to earn a living, and that any incidental obstruction of interstate commerce was thus justified. "This would be to eat up the rule under the

guise of an exception," wrote Justice Cardozo. *Id.* at 522–23, 55 S.Ct. at 500. In rejecting a final argument that the price of milk was directly related to its wholesomeness, the Court stated:

> The next step would be to condition importation upon proof of a satisfactory wage scale in factory or shop, or even upon proof of the profits of the business. Whatever relation there may be between earnings and sanitation is too remote and indirect to justify obstructions to the normal flow of commerce in its movement between states.

*Id.* at 524, 55 S.Ct. at 501.

(A) *Whether the Regulations Directly Regulate Interstate Commerce or Discriminate Against Out-of-State Producers in Purpose or Effect*

■ Turning to the first tier of Commerce Clause analysis, the Court must determine whether the New Jersey milk pricing regulation directly regulates interstate commerce or discriminates against out-of-state producers in purpose or effect. The Court will address each of these issues in turn.

(1) *Direct Regulation*

Like the regulation at issue in *Baldwin*, New York asserts, the New Jersey below-cost regulation controls the price at which out-of-state producers may sell milk to dealers for ultimate sale in New Jersey, even if the producer-dealer transaction takes place outside New Jersey. Thus, according to New York, the New Jersey milk regulation directly regulates interstate commerce and is invalid under *Baldwin* and *City of Philadelphia, supra.*

---

**9.** *See also Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354, 71 S.Ct. 295, 297–98, 95 L.Ed. 329 (1951) (striking down a municipal ordinance that forbade the sale of pasteurized milk within the city unless it was pasteurized and bottled at an approved plant within five miles of the city); *H.P. Hood & Sons*, 336 U.S. at 545, 69 S.Ct. at 668 (striking down a New York statute that the New York Agriculture Commissioner had used in denying a license to a Massachusetts distributor on the ground that its licensure would adversely affect New York economic interests);

*Milk Control Board v. Eisenberg Farm Products*, 306 U.S. 346, 352–53, 59 S.Ct. 528, 531, 83 L.Ed. 752 (1939) (upholding a Pennsylvania statute that required a Pennsylvania dealer to obtain a license from the State, to post a bond and to observe minimum prices where the burdens on interstate commerce were merely incidental because there was "a comparatively large field remotely affecting and wholly unrelated to interstate commerce within which the statute operate[d]").

The Supreme Court has expressly held that "[f]orcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce." *Brown–Forman*, 476 U.S. at 582, 106 S.Ct. at 2086 (citing *Edgar v. MITE Corp*, 457 U.S. 624, 642, 102 S.Ct. 2629, 2640, 73 L.Ed.2d 269 (plurality opinion)). In *Brown–Forman* the Court struck down a New York law that required every distiller or producer that sold liquor to wholesalers within the State to sell at a price no higher than the lowest price that it charged to wholesalers anywhere else in the United States. *Id.* at 582–84, 106 S.Ct. at 2086–87. In *Edgar* the Court struck down an Illinois blue-sky law that regulated transactions that took place across state lines even if wholly outside the State, with a plurality agreeing that the statute was a direct regulation of interstate commerce in violation of the Commerce Clause. 457 U.S. at 641–43, 102 S.Ct. at 2640–41.[10] New York argues that the present case fits squarely within those holdings. Defendants assert, however, that this Court should not deem the sale in New York by a New York dealer to a New Jersey retailer to be a transaction taking place in New York; reminding the Court that the ultimate destination of the product in question is New Jersey, defendants would have the Court view the dealer-retailer sale in New York as not a transaction in its own right but rather a mere precursor to the ultimate consumer transaction in New Jersey. New York's argument finds support in a Fifth Circuit ruling affirmed by the Supreme Court without opinion, *Louisiana Dairy Stabilization Board v. Dairy Fresh Corp.*, 631 F.2d 67 (5th Cir. Unit A 1980), *aff'd*, 454 U.S. 884, 102 S.Ct. 375, 70 L.Ed.2d 199 (1981). In that case the Louisiana milk control board promulgated regulations prohibiting price differentials by retailers and price discrimination between different purchasers of like commodities. The board's regulations required dairy processors to be licensed and to pay assessments of three cents per hundred-

weight on all milk equivalents used in the processing of dairy products. The regulations made no distinction between in-state and out-of-state processors. *Id.* at 68. The Fifth Circuit affirmed the district court's determination that the regulations violated the Commerce Clause because they unreasonably burdened the flow of interstate commerce by restricting the access of out-of-state suppliers to Louisiana markets in order to protect local economic interests. *Id.* at 68–69. The court did so while noting that its ruling had the effect of relieving out-of-state processors of any obligation to pay assessments on milk processed, sold and delivered out-of-state, *even though sold and delivered to Louisiana purchasers and packaged and intended for retail sale by those purchasers in Louisiana.* *Id.* at 68.

The Fifth Circuit's opinion supports New York's argument that New Jersey may not regulate dealer-retailer transactions that occur outside that State. Under this view, the New Jersey milk control regulations would violate the Commerce Clause to the extent that they regulate the price that an out-of-state dealer may charge a New Jersey retailer in a transaction that occurs outside New Jersey. The Court, however, does not view the instant case to be one of direct regulation. The best method of determining whether a state law regulates interstate commerce—assuming the case is not an obvious one where a State forbids the entry of or imposes a tariff on goods produced in other States—is to inquire whether the statute or regulation has the same effect as a tariff—that is, if the law gives an advantage to the enacting State's industries or destroys a competitive edge enjoyed by out-of-state industries. *See Baldwin*, 294 U.S. at 521–22, 527–28, 55 S.Ct. at 500, 502–03; *Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission*, 837 F.2d 600, 612 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988). If the law in question does not function as a tariff, but

---

**10.** A majority of the *Edgar* Court found the statute to violate the Commerce Clause under the alternative test of *Pike v. Bruce Church*, *supra. Edgar*, 457 U.S. at 643–46, 102 S.Ct. at 2641–42.

rather affects intrastate and interstate commerce evenhandedly to effectuate legitimate state objectives, then the effects on interstate commerce are viewed as merely incidental. This does not remove the law from all Commerce Clause scrutiny, of course, since it still must survive a *Pike v. Bruce Church* balancing test. *Kentucky West Virginia Gas*, 837 F.2d at 612.

The New Jersey regulation at issue here, unlike the New York regulation at issue in *Baldwin* and unlike prior New Jersey regulations enacted under the Milk Control Act, does not function as a tariff but instead regulates intrastate and interstate commerce evenhandedly. While the other regulations set an out-of-state dealer's minimum price as no lower than the costs of instate dealers, the current New Jersey regulation sets an out-of-state dealer's minimum price (as well as those of in-state dealers) as no lower than *its own costs*. Because the below-cost regulation measures every dealer against its own efficiency, and not the efficiency of New Jersey dealers, it does not amount to direct regulation of interstate commerce. It may have incidental effects on interstate commerce, but these will be weighed on the *Pike v. Bruce Church* balance to determine whether the regulation violates the Commerce Clause.[11]

### (2) *Intentional Discrimination*

New York contends that the New Jersey Milk Control Statute and below-cost regulations intentionally discriminate against out-of-state producers. New York's first piece of evidence to support this contention is the New Jersey Legislature's declaration that the purpose of the Milk Control Act was to salvage the State's dairy industry. Ch. 274, 1941 N.J. Laws 713; *see supra* note 1.

The Court does not find this statement to evince purposeful discrimination. A fair reading of the preamble indicates no more than that the statute was aimed at protecting New Jersey's milk industry *from itself*, not from outside competition. New York points next to § 49 of the Milk Control Act, N.J.S.A. § 4:12A–49, which provides:

It is the intent of the Legislature that the instant, whenever that may be, that the handling within the State, by a milk dealer, of milk produced outside of the State, becomes a subject of regulation by the State, in the exercise of its police powers, the restrictions set forth in this act respecting such milk so produced shall apply and the powers conferred by this act on the director shall attach. After any such milk so produced shall have come to rest within the State, any sale, within the State, by a licensed milk dealer, processor, subdealer or store or a milk dealer required by this act to be licensed, of any such milk purchased from the producer at a price lower than that required to be paid for milk produced within the State, purchased under similar conditions, shall be unlawful and deemed a violation of this act, and for continued violations the director, by the Attorney–General, may maintain an action in the Superior Court to restrain such further unlawful acts.

Contrary to New York's assertions, however, the above section does not evince intentional discrimination. New York seems to be cross-breeding the concepts of direct regulation and intentional discrimination to arrive at the hybrid of intentional regulation. This hybrid, however, as long as it does not amount to intentional *direct* regulation, *see supra* Part III(A)(1), is not per se violative of the Commerce Clause.

---

**11.** The Court notes the undesirable consequences of a ruling that the below-cost regulation may not reach dealer-retailer transactions in another State even though the goods exchanged are intended for ultimate retail sale in New Jersey. In the wake of such a ruling, New York dealers could set up dummy corporations in New Jersey and transfer ownership of milk products to the New Jersey dummy corporation in New York. The phony New Jersey "dealer" could then sell New York milk in New Jersey at any price with complete immunity from New Jersey regulation; it could presumably even sell the milk below the New York dealer's average variable cost as long as the New Jersey dummy dealer "bought" it from the New York dealer at that price. The Court, however, does not wish to encourage such subterfuge. And even New York seems to concede that New Jersey has the right to prohibit the sale of New York milk in New Jersey below the New York dealer's average variable cost.

In the instant case, although the New Jersey Legislature may have intended to regulate interstate commerce, there is no basis for finding that it intended to directly regulate such commerce or to regulate such commerce in a discriminatory manner. The Court finds no obvious protectionist intent in the New Jersey Milk Control Act.

The Court's conclusion is not changed by findings of the New Jersey Supreme Court cited by New York. It is true that legislative intent is a matter of state law on which the highest state court speaks with finality. *Mullaney v. Wilbur*, 421 U.S. 684, 690–91, 95 S.Ct. 1881, 1885–86, 44 L.Ed.2d 508 (1975); *Minotti v. Lensink*, 798 F.2d 607, 610 (2d Cir.1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987). The cases cited by New York, however, like the statute itself, establish no more than that the statute was enacted to help the State's dairy industry in a time of crisis. *See Abbott Dairies, Inc. v. Armstrong*, 14 N.J. 319, 329–30, 102 A.2d 372, 377 (1954); *National Dairy Products Co. v. Milk Control Board*, 133 N.J.L. 491, 497, 44 A.2d 796, 799 (S.Ct.1945). The only New Jersey Supreme Court case that hints at protectionism, *Garden State Farms, Inc. v. Mathis*, 61 N.J. 406, 426–27, 294 A.2d 713, 723 (1972), indicates only that there may have been a protectionist motive in the enactment by the Director of the Division of Dairy Industry of an order that is now defunct and not at issue here.[12] The highest court of New Jersey made no determination in *Garden State Farms* as to whether the Milk Control Act of 1941 itself was motivated by a desire to protect the New Jersey dairy industry from out-of-state competitors. This Court declines to read an impermissible motive on the part of an administrator in 1969 as evidence of an improper motive on the part of the Legislature in 1941.

A review of the Milk Control Act itself and the New Jersey Supreme Court's interpretation of the statute's purposes has revealed no clear evidence that the statute was enacted with the intent to discriminate against out-of-state products or purveyors of such products.

**(3)** *Discrimination in Fact*

In support of its claim of a discriminatory effect, New York, as already noted, has produced evidence that in 1987 alone at least 30 applications by New York dealers to supply New Jersey retailers were denied by defendants on the ground that the sales prices were below their dealers' average total cost (but above their average variable cost). Noticeably absent from the record, however, is any evidence as to what *percentage* of applications by New York dealers this figure amounts to and the corresponding figures for New Jersey dealers. Thus the Court is unable at this point to determine whether the below-cost regulation has had a discriminatory effect on interstate commerce. The parties shall have an opportunity to develop the record further to aid the Court in resolution of this issue.

**(B)** *Whether the Local Benefits of the Regulations Outweigh Any Incidental Effects on Interstate Commerce*

Unlike the regulations at issue in *Baldwin*, the New Jersey provisions regulate evenhandedly: they apply to both in-state and out-of-state dealers and they set an out-of-state dealer's minimum allowable price with respect to the dealer's own costs and not with respect to those of New Jersey dealers. The Court also finds that the regulations serve a legitimate public interest in that they seek to ensure the continued availability of wholesome milk to New Jersey consumers and to ensure the continued vitality of the State's dairy industry. But even if the Court ultimately finds no discriminatory effect on interstate commerce, the New Jersey milk regulations nevertheless have an incidental effect on interstate commerce in that they are prohibiting certain transactions between New

---

**12.** The order at issue in *Garden State Farms*, Order 69–1, established an absolute minimum on retail milk prices (as distinguished from a relative minimum, whereby each dealer's minimum price is set with respect to its own competitiveness). *See* 61 N.J. at 413–16, 294 A.2d at 716–18.

York dealers and New Jersey retailers. The critical question in a *Pike v. Bruce Church* balancing test, then, is whether the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits. 397 U.S. at 142, 90 S.Ct. at 847; *see also Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084; *Raymond Motor*, 434 U.S. at 441–42, 98 S.Ct. at 794. Cognate to this inquiry is whether the legitimate local interest could be promoted in a manner that has a lesser impact on interstate commerce. *Pike*, 397 U.S. at 142, 90 S.Ct. at 847.

Relying on antitrust principles, New York argues that New Jersey could prevent predatory pricing and thus ensure the availability of milk at low prices to New Jersey consumers by using a means less burdensome to interstate commerce, namely, by adopting an average variable cost standard rather than one based on average total cost. Courts and commentators have divided the pricing range into three zones for determining whether pricing is predatory: pricing below average variable cost; pricing above average variable cost but below average total cost; and pricing above average total cost. *E.g.,* Jaskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy*, 89 Yale L.J. 213, 250–55 (1979). According to Professors Areeda and Turner, the authors of an influential law review article that has been followed by many courts, pricing at or above reasonably anticipated average variable cost should be conclusively presumed lawful, while pricing below that level should be conclusively presumed unlawful. Areeda & Turner, *supra*, 88 Harv.L.Rev. at 733.

Pricing in the intermediate category (between average variable cost and average total cost) carries a *conclusive* presumption of legality in at least one circuit, *Northeastern Telephone Co. v. American Tele-* *phone and Telegraph Co.*, 651 F.2d 76, 88 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), and a *rebuttable* presumption of legality in several others, *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1346 (8th Cir.1987); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1056 (6th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1035–36 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982) [13]; *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 432 (7th Cir.1980); *Pacific Engineering & Production Co. v. Kerr–McGee Corp.*, 551 F.2d 790, 797 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977). The Third Circuit has not spoken definitively on the subject, but has indicated its likely support for the theory that pricing between average variable cost and average total cost is at least rebuttably, if not conclusively, nonpredatory. In *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 352 (3d Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982), the court was faced with pricing above average total cost, so did not need to address the permissibility of pricing below average total cost but above average variable cost. The court stated: "While we are inclined to accept the basic premise of the Areeda and Turner thesis that predatory intent may not be inferred from sales at or above average variable cost ..., we need not declare our adherence to that or any other economic theory proposed." *Id.; see also Sunshine Books, Ltd. v. Temple University*, 697 F.2d 90, 91 (3d Cir.1982) (assuming, without deciding, the validity of the Areeda and Turner thesis).

In a rather conclusory manner,[14] defendants object to New York's invocation of

---

**13.** *See also Transamerica Computer Co. v. International Business Machines Corp.*, 698 F.2d 1377, 1384–86 (9th Cir.1983), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983).

**14.** Defendants argue:
The antitrust cases cited by New York are *simply* unhelpful to a court which is asked to consider whether legitimate price controls at the state level violate the Commerce Clause, or whether the manner of setting prices affects the lawfulness of valid price regulations. The antitrust laws which apply to the setting of prices in the private market place *simply* have no applicability to the question of wheth-

antitrust principles and protest that such principles are inapplicable to a Commerce Clause analysis. The Court disagrees. The interests asserted by New Jersey—preserving its milk industry and protecting its consumers by preventing predatory pricing—sound in antitrust. The Areeda and Turner theory, as adopted in large part by many circuits, posits that pricing between average variable cost and average total cost has negligible destructive effects on competition. By force of this theory, there is arguably little mass on the side of the scale that measures the benefit of the below-cost regulation to New Jersey consumers or even the New Jersey milk industry. There seems to be more substance on the other side of the balance: although there is an exception that allows a dealer to price below cost in order to meet the price of a competitor, New York contends that in order to successfully compete in the New Jersey market, New York dealers must be allowed to *better* their competitors' prices, not just meet them. Affidavit of Henry Beyer, ¶ 11. Moreover, the *Pike v. Bruce Church* balancing test requires the Court to consider the availability of alternative means that may advance the State's legitimate aims in a manner less burdensome to interstate commerce. Areeda and Turner's postulate that it is pricing below average *variable* cost (as a substitute for marginal cost) that is destructive to competition supports New York's argument that New Jersey has such an alternative means at its disposal. That the use of an average variable cost standard would be less burdensome to interstate commerce follows from the fact that average variable cost is by definition lower than average total cost. With respect to New York dealers such as Beyer and Dellwood, who wish to sell in the intermediate range, the New Jersey below-cost regulation is clearly having incidental effects on interstate commerce that could be alleviated by a standard based on average variable cost.

Viewing the record as it now stands, however, the Court is unable to conduct a complete balancing test pursuant to *Pike v. Bruce Church.* Neither New York nor New Jersey has weighed in with a plenary analysis of the relative effects of the current New Jersey below-cost regulation and a hypothetical regulation based on average variable cost.[15] To aid in its decision, the Court does not need additional legal argument so much as additional factual arguments. Some of the specific facts that need to be addressed, by expert analysis or otherwise, are as follows: (1) the number and percentage of New York dealers that would likely sell at a price between average variable cost and average total cost if they were allowed to do so; (2) to what extent the ability to do so would lower the barriers to entry into the New Jersey milk market for New York-based dealers; (3) whether, in the specific context of the New Jersey dairy market, the Areeda and Turner thesis is correct in predicting no destructive effects on competition for pricing between average variable cost and average total cost.[16] Accordingly, the Court will deny the cross-motions for summary judgment and allow for further development of the record.

## CONCLUSION

The Court determines that it has subject matter jurisdiction over this action, that the State of New York has standing to bring the action, that the New Jersey below-cost regulation does not directly regulate interstate commerce and that New Jersey has not intentionally discriminated against interstate commerce. Nevertheless, the

er states—or the federal government—may regulate prices or, if so, by what criteria. Defendants' Reply Brief, at 5–6 (emphasis added). Courts and litigants alike are in the habit of using the word "simply" to bridge gaps in logic. *See* Barnett, *Simply Put at the Court,* Nat'l L.J., May 15, 1989, at 13.

**15.** Much of the parties' attention has heretofore focused on the nonsubstantive issues, such as jurisdiction and standing, and on substantive issues that the Court has now disposed of, such as intentional discrimination and direct regulation of interstate commerce.

**16.** As noted above, the milk industry is particularly susceptible to destructive competition. It may be that the Areeda and Turner model must be modified in the case of such a perishable commodity.

Court will deny the cross-motions for summary judgment. Within 30 days of the date hereof, the parties shall submit to the Court any documentary evidence that they wish the Court to consider in determining whether the New Jersey below-cost regulation has a discriminatory effect on interstate commerce and whether the regulation is justified under a *Pike v. Bruce Church* balancing test. The parties may submit therewith a supplemental brief not exceeding 30 pages in length. If the parties wish to present live testimony or further oral argument on any of these issues, they shall so notify the Court within 15 days of the date hereof so that the Court may set a hearing date. Otherwise, the Court will decide the matter on the papers. The Court invites Beyer Farms, Inc., the plaintiff in *Beyer Farms, Inc. v. Brown*, 721 F.Supp. 644, to move to intervene in this action pursuant to Fed.R.Civ.P. 24. The Court likewise invites Cumberland Farms, Inc., which has already been granted permission to intervene in *Beyer*, to move to intervene in this action, although the maximum scope of Cumberland's intervention will, of course, be governed by the Court's July 14, 1988 letter opinion and order in *Beyer*. Such motions may be made returnable on short notice (on a minimum of seven days' notice) so that the Court may consider any submissions by Beyer Farms as well.

An order implementing this opinion has been filed herewith.

### ORDER

For the reasons discussed in an opinion of the Court filed herewith,

It is on this 24th day of May, 1989

ORDERED that the parties' cross-motions for summary judgment are denied; and it is further

ORDERED that within 30 days of the date hereof the parties shall submit to the Court any further documentary evidence that they wish the Court to consider in determining whether the New Jersey below-cost regulation has a discriminatory effect on interstate commerce and whether

the regulation is justified under a *Pike v. Bruce Church* balancing test; and it is further

ORDERED that the parties may file therewith a supplemental brief not exceeding 30 pages in length; and it is further

ORDERED that if the parties wish to present live testimony or further oral argument, they shall so notify the Court within 15 days of the date hereof; and it is further

ORDERED that leave is hereby granted to Beyer Farms, Inc., plaintiff in *Beyer Farms, Inc. v. Brown*, Civil Action No. 87–3017, and Cumberland Farms, Inc., an intervenor in that action, to move on short notice (on a minimum of seven days' notice) to intervene in this action pursuant to Fed. R.Civ.P. 24, so that the Court may, if such motion is granted, consider similar submissions by that party on the issues remaining in this case.